## 36836. MESSER v. THE STATE.

GREGORY, Justice.

This is a death case. The defendant was convicted of the murder and kidnapping with bodily injury of his eight-year-old niece. The jury fixed the defendant's punishment as death for the murder, finding as the aggravating circumstances that the offense of murder was committed while the offender was engaged in the capital felony of kidnapping with bodily injury (Code Ann. § 27-2534.1 (b) (2)), and that the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture to the victim (Code Ann. § 27-2534.1 (b) (7)). The jury found that the kidnapping with bodily injury was outrageously or wantonly vile, horrible or inhuman in that it involved torture to the victim and an aggravated battery to the victim and sentenced the defendant to death for this offense. Code Ann. § 27-2534.1 (b) (7).

The jury was authorized to make the following findings of fact:

On February 13, 1979, the date of the murder, the defendant left his home to attend a doctor's appointment. He waited at the doctor's office briefly, then departed before the time for his appointment arrived. Around mid-day he went to an electrical supply store. There he told the saleswoman that he worked for a construction company in Rome and needed a specialized light fixture. After inspecting the light fixtures on display in the store he appeared dissatisfied, and told her that he wanted to look at "more stuff . . . that will probably be in the back." The saleswoman invited him to examine the light fixtures in the supply room, located at the back of the store, but informed him that she could not assist him as she was alone in the store and needed to supervise the unloading of a delivery truck that had just arrived. When the defendant persisted in his requests that the saleswoman assist him in the back of the store, she became nervous. Suspecting the defendant's motives, the saleswoman telephoned her husband, who worked nearby, and asked him to come to her assistance. During this period of time the defendant did not venture into the supply room. When the defendant saw the saleswoman's husband enter the store, he left. The saleswoman testified that she observed the defendant shake his head and mouth the word "damn" as he left.

At trial the saleswoman testified that she had seen defendant in the store three months prior to this incident. At that time he had also attempted, unsuccessfully, to get her to go into the back room of the store to look for a specialized item.

Around 2:30 that afternoon the saleswoman saw the defendant drive slowly by the electrical supply store. She ran out into the street

and took down his license plate number. The saleswoman testified that she watched the defendant turn in the direction of College Street Elementary School which is located a few blocks from the electrical supply store. That night she and her husband telephoned the police to report this suspicious incident and to request that the police investigate the defendant. The following night the police asked the couple to examine photographs at the police station to see if they could identify the man. Both selected a picture of the defendant. The license plate number taken down by the saleswoman matched the license number of the defendant's car.

On the date of her death the victim was attending College Street Elementary School. The victim's teacher testified at trial that the victim had an "uneasy, nervous" nature which had complicated her adjustment to school routine. The victim apparently cried most of the day, had difficulty socializing with other children, and frequently voiced her fear that her mother would desert her and that she would be left alone at home after school. At 2:30 that afternoon the victim was preparing to board the school bus that would take her home when the principal called the victim's homeroom to say that her uncle, the defendant, was there to take her home. The defendant had informed the principal that the victim's father had been injured on a construction job and that the victim's mother, too upset to drive herself, had requested that the defendant pick the victim up at school. When the victim saw her uncle she ran up to him and, according to an observer, began "prancing around him." The principal testified that the victim took the defendant's hand and "petted" it. The victim excitedly told her teacher that she would not have to ride the bus as her uncle would take her home. Subsequently the victim and the defendant left the school together. The principal later identified a police photograph of the defendant as the man who had picked up the victim.

Between 2:45 and 3:00 that afternoon the victim's mother arrived at the school, alarmed that the victim had not come home on the school bus. The mother denied authorizing the victim's uncle, or anyone else, to pick her up. The victim's mother testified that the principal's description of the man "fit [the defendant] to a 'T.'" The victim's mother telephoned the defendant's wife to see if the child was at their home as the defendant and his wife frequently baby-sat for the victim. Defendant's wife told her that she had not seen the victim that day and that the defendant had gone to the doctor.

At trial a witness testified that at about 3:30 that afternoon she observed the defendant walking away from the woods where the victim's body was later found.

Arriving home the defendant spoke at length to his family about

his long and futile wait at the doctor's office. When informed of the victim's abduction, defendant told the victim's family that he had seen a child resembling the victim in a "dark colored car . . . headed north," but that he otherwise knew nothing of the circumstances surrounding her absence.

The following day the victim's family conducted an extensive search for the child. A sister-in-law of defendant, driving by the wooded area where defendant had taken the victim, spotted the victim's coat. A police search ensued and subsequently the victim's book and crayons were found. Further search uncovered the body of the victim, clad only in a knit shirt.

The victim had been stabbed numerous times in the chest and abdomen. Her face had been so severely beaten that it was not readily recognizable. Her abdomen had been slashed five times by a knife, and bruises and lacerations covered her face, neck and upper chest. Spermatozoa were found in the victim's vaginal area, but there was no evidence to indicate that she had been raped. Autopsy results showed that she had bled to death.

That night the defendant and his wife voluntarily accompanied GBI agents to the police station for questioning. Although not under arrest at that time, the defendant was given Miranda warnings and subsequently signed a waiver form. After being confronted with the fact that he had been identified as the person who removed the victim from school, the defendant confessed to the murder of his niece. A GBI agent testified that defendant told him "after not getting anywhere . . . with the female employee" at the electrical supply store, "the first thing that came to his mind was [the victim] and that's why he went to the school to get her." The defendant stated that he had driven the victim to a wooded area and parked the car. He told her that he was having trouble with the battery cables in his car and needed to find a rock to fix them. She accompanied him into the woods to search for a rock. Telling her that he "wanted to play a game with her" the defendant pushed the victim down to the ground, removed her slacks and began touching her "between the legs." The defendant repeatedly stated to the GBI agents that he had originally intended to "just molest" the victim and to "make her promise not to tell her father," but that the victim refused to cooperate with him and began to scream. He stated that he hit her repeatedly with his fist to quiet her. He masturbated on the left side of the victim's abdomen and finally stabbed her with his pocketknife to silence her. The defendant then kicked the victim in the face until she lay motionless. The defendant told the agents that he washed his pocketknife in a nearby stream, then returned to his parked car where he removed the victim's coat, book and crayons and threw them into the woods.

After the defendant confessed to the crime, he was placed under arrest and reminded of his Miranda warnings. The police accompanied defendant to a nearby hospital where blood samples and hair specimen were taken. Expert testimony presented at trial established that the hair found on the shirt and pants defendant had been wearing on the day of the murder belonged to the victim. The shoes defendant had been wearing at that time corresponded to the plaster cast of a partial shoe track found at the scene of the crime. Traces of blood were found on defendant's pocketknife, but were of an amount too small to type.

(1) Defendant first contends that the trial court erred in failing to grant his motion for an independent psychiatric examination at government expense.

In March, 1979 the defendant underwent a psychiatric examination at Central State Hospital. It was determined at that time that he was competent to stand trial. An indictment was returned against defendant in November, 1979. The following month defendant entered a special plea of insanity and simultaneously made a motion for independent psychiatric evaluation, stating that, without it, he would be unable to adequately prepare his defense. The trial court denied the motion, finding that the defendant had not shown sufficient grounds in support of his motion. Defendant's motion for reconsideration was also denied, but the trial court ordered that defendant should be returned to the state facility at Milledgeville for further examination to determine his competency to stand trial. The second report stated that defendant was competent to stand trial. Subsequently defendant withdrew his special plea of insanity.

The grant or denial of a motion for independent psychiatric evaluation lies within the discretion of the trial court and will not be overturned unless an abuse of discretion is shown. *Dampier v. State,* 245 Ga. 427 (265 SE2d 565) (1980); *Leggett v. State,* 244 Ga. 226 (259 SE2d 476) (1979). We find no abuse of discretion in denying an independent psychiatric examination in this case.

(2) In his second enumeration of error defendant urges that the trial court erred in failing to exclude his confession. Defendant avers that the circumstances surrounding his confession were tainted by the fact that law enforcement officials did not advise him that he was the "sole suspect" in the case. Defendant relies on Windsor v. United States, 389 F2d 530 (5th Cir. 1968) in support of his contention that law enforcement officials were required to inform him that they were focusing their investigation on him alone. However, Windsor requires only that when the general inquiry into a crime "begins to focus on a particular suspect," Miranda warnings must be given to that suspect.

Miranda warnings were, in fact, given to the defendant in this case before the interview began.

There was some conflict in the testimony of the interviewing officers as to whether the defendant was the "sole suspect." Even if the defendant could show that he was the only suspect, the law does not require law enforcement officials to inform a suspect that they are focusing their investigation on him alone.

The trial court conducted a Jackson v. Denno hearing outside the presence of the jury before admitting defendant's confession into evidence. See 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964). At this hearing GBI agents testified that, although the defendant had asked to postpone the interview until after the victim's funeral, he had voluntarily accompanied them to the police station for questioning. Once there, the interviewing officers advised the defendant that he was not under arrest and was free to leave at any time. The defendant was informed of his Miranda rights and signed a waiver form prior to any questioning. After defendant confessed to the crime, officers placed him under arrest and reminded him of his Miranda warnings. The interviewing agents testified at the Jackson v. Denno hearing that the defendant never requested an attorney; that he never asked for the interview to cease; and that he was not under the influence of any type of alcohol or drugs. The defendant did not testify at the Jackson v. Denno hearing. The trial court ruled that the defendant had voluntarily confessed to the crime and admitted the confession into evidence.

At the close of all the evidence the trial court charged the jury that they must make an independent determination that defendant's confession was voluntarily made before they considered it.

The State is required only to prove by a preponderance of the evidence that the [defendant's] statement was voluntarily made. Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1971); Pierce v. State, 235 Ga. 237 (219 SE2d 158) (1975). The trial court determined that the State met that burden in this case. "Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal." Crawford v. State, 245 Ga. 89, 90 (263 SE2d 131) (1980); United States v. Watson, 469 F2d 362, 365 (5th Cir. 1972). See also, Hance v. State, 245 Ga. 856 (268 SE2d 339) (1980); Tyler v. State, 247 Ga. 119 (1981).

We have carefully reviewed the record and conclude that the trial court did not err in admitting defendant's confession.

(3) Defendant argues that the in-court identifications by two witnesses were tainted by a prior photographic display and should have been excluded by the trial court.

After accompanying law enforcement officers to police headquarters, defendant consented to have his photograph taken. Defendant's photograph, along with photographs of five other white males with facial characteristics similar to those of defendant, were subsequently shown to the principal of victim's elementary school and to the saleswoman at the electrical supply store. The principal selected the photograph of the defendant as the person who had removed the victim from school on the date of her death. The saleswoman identified the photograph of defendant as the man who had raised her suspicions in the electrical supply store.

"[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U. S. 377, 384 (88 SC 967, 19 LE2d 1247) (1968).

Thus Simmons outlines a two part test: first the court must determine whether the identification procedure was impermissibly suggestive. Only if the court determines that it was, need it decide whether there was a substantial likelihood of irreparable mis-identification. *McClesky v. State,* 245 Ga. 108 (263 SE2d 146) (1980); *Gravitt v. State,* 239 Ga. 709 (239 SE2d 149) (1977). In considering whether there has been a violation of a defendant's right to due process, the court must look to the totality of the surrounding circumstances and determine whether the identification was reliable even though the confrontation procedure may have been suggestive. Neil v. Biggers, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972).

The defendant in this case has pointed to no particularities of circumstance which would have rendered the photographic identification impermissibly suggestive. Upon examination of the record we conclude that there is no evidence that the photographic identification method used by police was impermissibly suggestive. The witnesses were asked only to identify the man who had picked up the victim at school and who had been present on the date of the victim's death in the electrical supply store. The identification testimony based on the photographs was allowed for these limited purposes. Furthermore, the in-court identification of defendant by these two witnesses had an independent basis. Both witnesses had had the opportunity to closely examine the defendant in daylight for several minutes.

Defendant also urges that the impermissible photographic display deprived him of his Sixth Amendment right to counsel. However, the record is clear that defendant was informed of his right

to counsel when he was given Miranda warnings, but that he never requested an attorney.

Therefore, we find this argument to be without merit.

(4) Defendant argues that the trial court erred in failing to grant his motion for a change of venue based on excessive, adverse pre-trial publicity.

"The test as to whether pretrial publicity has so prejudiced a case that an accused can not receive a fair trial is whether the jurors summoned to try the case have formed fixed opinions as to guilt or innocence of the accused from reading such publicity." *Dampier v. State,* supra, at 431. "To hold that the mere existence of any pre-conceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1960).

The majority of the 48 prospective jurors examined in this case stated that they had been exposed to varying amounts of publicity surrounding the crime. However, only four stated that they would not be able to put aside any prejudice arising out of the pre-trial publicity and render a verdict based on the evidence. These four jurors were excused by the court. This low percentage of veniremen excused for prejudice (approximately 8.3 percent) corroborates the absence of such prejudicial publicity as would require the grant of a motion for a change of venue.[1] Murphy v. Florida, 421 U. S. 794 (95 SC 2031, 44 LE2d 589) (1975); *Dick v. State,* 246 Ga. 697 (273 SE2d 124) (1980) (10 percent dismissal rate corroborates absence of prejudicial bias); *Green v. State,* 246 Ga. 598 (272 SE2d 475) (1980) (5 percent dismissal rate corroborates absence of prejudicial bias); *Collier v. State,* 244 Ga. 553 (261 SE2d 364) (1979) (20 percent dismissal rate corroborates absence of prejudicial bias); *Coleman v. State,* 237 Ga. 84 (226 SE2d 911) (1976) (49 percent dismissal rate corroborates absence of prejudicial bias); *Butler v. State,* 231 Ga. 276 (201 SE2d 448) (1973) cert. den. 420 U. S. 907 (1974) (36 percent dismissal rate corroborates absence of prejudicial community bias); cf. Irvin v. Dowd, supra, (62 percent corroborates actual jury partiality).

The defendant has failed to show that a " 'pattern of deep and bitter prejudice' " created by the pretrial publicity was "present throughout the community" and was reflected in the verdict reached

[1] To the extent these percentages reflect a pattern of prejudice existing throughout the community, they are significant. To arrive at the percentage, divide the number of veniremen excused for prejudice by the total number of veniremen questioned.

by the jurors who tried him. Irvin v. Dowd, supra, at 727. Therefore, there is no merit to this argument.

(5) The defendant next cites as error the trial court's refusal to permit the sequestration of jurors during individual voir dire. Defendant argues that jurors "in sympathy with the victim's family" would tend to merely parrot the responses they heard from other jurors.

"Code Ann. § 59-705 gives defense counsel the right to examine jurors individually after the usual voir dire questions have been put by the trial court to the jury as a panel. The right does not encompass isolated examination. The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination. The control of the pursuit of such determination is within the sound legal discretion of the trial court, and only in the event of manifest abuse will it be upset upon review." *Whitlock v. State,* 230 Ga. 700, 705 (198 SE2d 865) (1973). See also, *Finney v. State,* 242 Ga. 582 (250 SE2d 388) (1978).

In this case the trial court permitted defense counsel to thoroughly examine each of the prospective jurors. Defense counsel has not demonstrated to this court how the presence of other jurors impeded his ability to examine any individual juror. Nor has he shown that any juror did tend to parrot the responses made by fellow jurors.

We conclude that the trial court did not abuse its discretion in refusing to permit individual voir dire outside the presence of the other jurors.

(6) Last, defendant argues that the trial court erred in failing to grant his motion for a mistrial.

During the direct examination of one of the GBI agents who had interviewed the defendant, the agent testified that defendant stated to him that he had not attempted sexual intercourse with the victim "because he didn't want to hurt her."

The record shows that at this juncture the victim's father "lunged" toward the defendant, screaming, "He ... He'll pay. You're liable ... you'll pay. You'll pay. You're liable. Oh! What you think ... oh you . . . you're going to get it . . . you."

The trial court immediately sent the jury to the jury room and the victim's father was removed from the courtroom by a state trooper. At this time the defendant moved for a mistrial. The trial court deferred ruling on the motion until the jury had been instructed concerning the outburst. The court instructed the jury that the victim's father had been present in the courtroom by agreement between the defense counsel and the State; that the father's outburst

should be given no weight in determining the guilt or innocence of the defendant; that the jury was only to consider physical evidence or sworn testimony in reaching their verdict. The trial court then requested that the jurors be candid and inform the court at that time if they felt the outburst would, in any way, affect their verdict. There was no response from any of the jurors. The defendant renewed his motion for a mistrial which the trial court denied.

Before the trial entered the punishment phase, the trial court again instructed the jury to disregard the outburst and again inquired of the jurors whether the outburst would influence them in deciding on the punishment. There was no response from any of the jurors.

At the hearing on the motion for a new trial defendant presented testimony from one juror who stated that, immediately after the disruption in the courtroom he had attempted to calm down a female juror who had been made visibly upset by the father's outburst. When questioned by the court, he stated that the outburst had had no influence on him, either in reaching the verdict or in determining the punishment. The female juror who had allegedly been upset by the outburst testified that she "wasn't that much upset"; that she was "fine" within a few minutes of returning to the jury room; and that thereafter she "just didn't pay it any attention." She also testified that in no way did the outburst affect her decision as to the verdict or punishment.

At this hearing the court inquired of each juror whether the father's outburst had affected his decision in either the guilt/innocence or punishment phase of the trial. Each juror responded in the negative.

Measures to be taken as a result of demonstrations and outbursts which occur during the course of a trial are matters within the trial court's discretion unless a new trial is necessary to insure a fair trial. Where the trial court fails to act to stop a disturbance, or fails to instruct the jury to disregard it, and the demonstration will prevent the defendant from receiving a fair trial, the court must grant a new trial. See *Sheppard v. State,* 235 Ga. 89, 91 (218 SE2d 830) (1975); *Shy v. State,* 234 Ga. 816 (III) (218 SE2d 599) (1975); *Avery v. State,* 209 Ga. 116, 126 (70 SE2d 716) (1952).

In this case the trial court sent the jury out of the courtroom as soon as the disturbance began. The offending person was immediately removed from the courtroom. Moreover, the jurors were fully instructed on two occasions to not let the outburst interfere with their responsibilities as jurors. On the hearing of the motion for new trial, each juror was thoroughly questioned as to whether the outburst affected his decision. We cannot say that under these

circumstances the trial court abused its discretion in denying defendant's motion for a mistrial.

### *Sentence Review.*

In the sentence review of this case we have considered the aggravating circumstances found by the jury and the evidence concerning the crime and the defendant. We have reviewed the sentence as required by Georgia Law 1973, p. 159 et seq.; Code Ann. § 27-2537 (c) (-3), as we have in each case involving the death penalty under this statute. We find that the evidence factually substantiates the verdict and supports the finding of guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

After reviewing the record in this case, we find that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor. See Division 6, supra.

As to Count 1 of the indictment, the jury found that the murder of the victim was committed while the offender was engaged in another capital felony, to wit: kidnapping with bodily injury, Code Ann. § 27-2534.1 (b) (2), and, in addition, that the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture to the victim, Code Ann. § 27-2534.1 (b) (7). As to Count 2 of the indictment, the jury found that the offense of kidnapping with bodily injury was outrageously vile or inhuman in that it involved torture to the victim and aggravated battery to the victim.

We find that the evidence supports the finding that the murder was committed while defendant was engaged in the capital felony of kidnapping with bodily injury. *Pryor v. State,* 238 Ga. 698 (234 SE2d 918) (1977).

The record shows that the defendant molested the victim, his eight-year-old niece, then stabbed her to silence her cries. The defendant continued to beat and kick the victim until she remained motionless. The blows to the victim's head were so forceful that they tore the skin and connective tissue away from her skull. The defendant then abandoned the victim to bleed to death.

By any rational standard the murder and the kidnapping with bodily injury were outrageously and wantonly vile, horrible and inhuman. In that respect this matter is distinguishable from those murders in which the death penalty is not appropriate. *Hance v. State,* supra, *Patrick v. State,* 245 Ga. 417 (265 SE2d 553) (1980). The evidence shows that the victim was quite happy to see the defendant at her school. She guilelessly accompanied him into the woods to look for "a rock to fix his car." The victim was totally incapable of

defending herself against the defendant's brutal attack. The defendant stabbed and beat the victim, then abandoned her to suffer a horrible death.

In *Hance v. State,* supra, this court set forth those standards which must be met in order to constitutionally apply Code Ann. § 27-2534.1 (b) (7) in light of the United States Supreme Court decision of Godfrey v. Georgia, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980). In *Hance* we held that torture, as the term is used in the statute, occurs when the victim is subjected, as in this case, to serious physical abuse prior to death. The evidence here supports a finding of serious physical abuse prior to death. Additionally, the evidence supports a finding of an aggravated battery prior to death. *Hance v. State,* supra.

We have thoroughly reviewed the instructions of the trial court during the sentencing phase of the trial and find that the charge is not subject to the defects dealt with in *Fleming v. State,* 240 Ga. 142 (240 SE2d 37) (1978) and *Hawes v. State,* 240 Ga. 327 (240 SE2d 833) (1978). Reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or a life sentence was imposed. We find that the following similar cases listed in the appendix support the affirmance of the death penalty. The appellant's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 3, 1981 —
REHEARING DENIED MARCH 18, 1981.

*John E. Sawhill III,* for appellant.

*W. A. Foster III, District Attorney, Barbara V. Tinsley, Assistant District Attorney, Arthur K. Bolton, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

APPENDIX.

*House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Presnell v. State,* 241 Ga. 49 (243 SE2d 496) (1978); *Griggs v. State,* 241 Ga. 317 (245 SE2d 269) (1978); *Ruffin v. State,* 243 Ga. 95 (252 SE2d 472) (1979); *Bowen v. State,* 244 Ga. 495 (260 SE2d 909) (1979); *Patrick v. State,* 245 Ga. 417 (265 SE2d 553) (1980); *Thomas v. State,* 245 Ga. 688 (266 SE2d 499) (1980); *Hill v. State,* 246 Ga. 402 (271 SE2d 802) (1980); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980).