39458. SANBORN v. THE STATE.

CLARKE, Justice.

Appellant was convicted of the murder of Randolph Williams and of armed robbery and sentenced to life imprisonment on both counts. He appeals. We affirm the murder conviction and reverse the conviction of armed robbery.

Appellant and John Roy stole a car, a pistol, and a box of ammunition from a residence in Snellville, Georgia. Two days later they robbed a Majik Market in Americus, Georgia. In the course of the robbery the clerk, Randolph Williams, was shot and subsequently died. An anonymous witness called the police giving a report of the crime and describing a vehicle which he saw leaving the scene. The car was stopped and searched and appellant and Roy were arrested after the search uncovered the pistol used in the robbery, as well as the ammunition. After being given their Miranda rights, they both signed statements which were used in evidence against them after the court determined pursuant to a Jackson v. Denno hearing that the statements were freely and voluntarily given.

1. Appellant's first and second enumerations of error deal with the search of the car, the custodial interrogation, and the testimony of a ballistics expert tying the pistol found in the car to the murder. Appellant contends that the warrantless search was unlawful, that since the arrest was without probable cause the custodial interrogation was illegal, and that the ballistics testimony, depending upon the fruit of the illegal search, was inadmissible. This argument and all of its subparts depend upon the premise that the search was illegal. Appellant concedes that the initial stop, based upon the informant's tip, was lawful. Under the standard enunciated in Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), and Chambers v. Maroney, 399 U. S. 42 (90 SC 1975, 26 LE2d 419) (1970), the stop was proper. Appellant's argument concerning the lawfulness of the search following the stop must fail because appellant and his companion could have had no legitimate expectation of privacy in a stolen car. Under the reasoning of Rakas v. Illinois, 439 U. S. 128 (99 SC 421, 58 LE2d 387) (1978), appellant had no legitimate expectation of privacy in the automobile. Similarly, appellant had no possessory interest in the stolen property seized. Consequently, both the search and the discovery of the pistol and the ammunition were lawful. The arrest,

following discovery of the pistol and the ammunition, was based upon probable cause and the custodial questioning after the appellant was given Miranda warnings did not offend the Fourth Amendment protection against custodial interrogation following arrest on less than probable cause. Dunaway v. New York, 442 U. S. 200 (99 SC 2248, 60 LE2d 824) (1979).

2. In his third enumeration of error appellant contends that the court erred in finding that he waived his right to remain silent and his right to counsel during questioning. He insists that under Townsend v. Sain, 372 U. S. 293 (83 SC 745, 9 LE2d 770) (1963); Reck v. Pate, 367 U. S. 433 (81 SC 1541, 6 LE2d 948) (1961); and Blackburn v. Alabama, 361 U. S. 199 (80 SC 274, 4 LE2d 242) (1960), the state has the burden of proving that a prisoner when questioned was coherent. The court in this case held a Jackson v. Denno hearing at which the state established to the court's satisfaction that appellant was coherent at the time of questioning, which took place several hours after his arrest. In the absence of evidence that the court's findings were clearly erroneous or evidence of a clear abuse of discretion, the findings of a trial court at a Jackson v. Denno hearing will not be disturbed. *Johnson v. State,* 233 Ga. 58 (209 SE2d 629) (1974). See also Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1972). A review of the record convinces us that the trial court's finding that appellant's statement was given freely and voluntarily and with knowledge of his rights was neither clearly erroneous nor an abuse of discretion.

3. Appellant argues that the court erred in refusing to grant sequestered individual voir dire after the judge handling the pretrial granted appellant's motion for sequestered voir dire. The state points out that at the time of pretrial the state still planned to seek the death penalty, which was no longer true by the time of trial. Sequestered voir dire is not mandated by OCGA § 15-12-133 (former Code Ann. § 59-705), which provides for individual examination of jurors. The granting of sequestered voir dire is within the discretion of the court, and a showing of prejudice from denial is necessary to show an abuse of discretion. *Smith v. State,* 245 Ga. 168 (263 SE2d 910) (1980); *Stinson v. State,* 244 Ga. 219 (259 SE2d 471) (1979).

4. Finally, appellant contends that the trial court erred in imposing sentence upon him for armed robbery since the armed robbery was a lesser included offense in the felony murder of which he was also convicted. The provisions of OCGA §§ 16-1-6 and 16-1-7 (Code Ann. §§ 26-505, 26-506), as well as our holdings in *Stanley v. State,* 240 Ga. 341 (241 SE2d 173) (1977), cert. den. 439 U. S. 882 (1978); *Atkins v. Hopper,* 234 Ga. 330 (216 SE2d 89) (1975) and *Burke v. State,* 234 Ga. 512 (216 SE2d 812) (1975), require that the armed

robbery conviction be set aside. Since proof of the armed robbery was essential to the conviction for felony murder, the armed robbery was a lesser included offense in the felony murder.

*Judgment affirmed in part; reversed in part. All the Justices concur, except Smith, J., who concurs specially as to Division 1 and the judgment.*

DECIDED JUNE 28, 1983.

*Crisp, Oxford & Gatewood, Howard S. McKelvey, Jr.,* for appellant.

*John R. Parks, District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

SMITH, Justice, concurring specially.

On February 26, 1982 Chris Butler,[1] age 21, was walking home from his girl friend's house in Americus, Georgia. At approximately 1:45 a.m., Butler entered the parking lot of the Kings Inn Motel, adjacent to a Majik Market convenience store located on McGarrah Street. As he approached the Majik Market, Butler noticed a black Camaro automobile parked behind the store. He then saw two white males run from the Majik Market, get into the Camaro, and drive off south toward Americus. By the time Butler reached the store entrance, the men were gone. Butler entered the Majik Market and, noticing that no clerk was on duty, walked to the back of the store and got a soda and a candy bar. Butler waited at the counter to pay for his snack. Approximately five minutes passed, and still no clerk had appeared, so Butler rapped loudly on the counter. No one responded. Noticing that the door to the refrigeration room was ajar, Butler knocked there also. When no one answered, he stepped inside the room and discovered the victim, a male, lying face down on the floor in a pool of blood. On his way out of the refrigeration room, Butler accidentally kicked an unfired shell which was left lying on the floor.

Butler went immediately to the pay telephone outside the store and called the police. He relayed to police everything he had seen that night. Officer Campbell of the Americus Police Department responded to the call, arriving at approximately 2:00 a.m. Butler led

---

[1] Chris Butler did not give his name to police on the night of the robbery. Two days later, however, he read in the local newspaper that police were looking for him. He voluntarily came forward and recounted what he had observed on the night of February 26, 1982.

the officer back into the storage room where the officer attended the injured clerk, recovered the unspent cartridge from the refrigeration room floor, and called an ambulance. Butler remained on the scene, available to the police, until the victim was placed into the ambulance. Investigators later recovered a .25 caliber shell casing from the shooting scene. The victim was shot once with a .25 caliber handgun. Another policeman, Officer Montgomery, was alerted to the apparent robbery by the police radio dispatcher at approximately 2:05 a.m. He arrived at the scene at 2:33 a.m.

Shortly after 2:00 a.m. that same night, Macon County Deputy Sheriff James L. Beard was on patrol when he received a radio lookout concerning the Majik Market armed robbery. Beard stopped at the Oglethorpe, Georgia police department, picked up Officer L. B. Hayes, and proceeded toward Americus, on the lookout for the black Camaro and its occupants. After passing through Andersonville and while driving south toward Americus, the officers met a car answering the description given in the armed robbery report from the Americus police department. The car, a black Camaro, was headed north toward Macon County. The officers immediately turned their car around and followed the suspicious car back into Andersonville. At the first intersection in Andersonville (not the main road), the driver of the Camaro suddenly braked and pulled off the main road onto a side street. Beard and Hayes followed the car closely, flashed their blue light, and caused the car to pull over to the side of the street. The car was a 1978 model black Camaro occupied by two white males, just as described by Butler and by the police radio dispatch.

The officers ordered Sanborn, who was sitting on the passenger side, and his companion to get out of the car. They complied. Beard and Hayes conducted a pat-down search of the two suspects and placed them in the back seat of the sheriff's car. The officers then searched the Camaro and discovered a .25 caliber automatic pistol under the seat on the passenger side, as well as a box of .25 caliber bullets. The car and two suspects were transported to the Americus police department. A search warrant was obtained, a thorough search conducted, and $159 in bills plus $1.86 in change was found. Further investigation revealed that approximately $176 was stolen from the Majik Market store that night. (The suspects had stopped and bought gas immediately after the robbery, accounting for the missing money.) Police later learned that the car, pistol, bullets and some other items recovered by police in the search had been stolen in Snellville, Georgia some two days before this incident.

Sanborn filed a motion to suppress the evidence obtained in the police searches of the car. The motion was denied, and Sanborn appeals.

In determining whether the stop of an automobile, its warrantless search, and any seizures subsequent thereto are not "unreasonable" under the Fourth Amendment, three questions must be answered in the affirmative. They are: (1) Is the Fourth Amendment of the U. S. Constitution applicable to this case? (2) Is there probable cause to stop, search and seize? (3) Are exigent circumstances present?

The first question was answered in the affirmative by the United States Supreme Court in Carroll v. United States, 267 U. S. 132 (45 SC 280, 69 LE 543) (1925). In Carroll the Court approved the warrantless stop and search of an automobile and the seizure of contraband found therein. In doing so it laid down a set of rules governing search of moveable vehicles which have become known as the "automobile exception" to the warrant requirement of the Fourth Amendment. The principles enunciated in Carroll and its progeny are grounded in the Fourth Amendment and are applicable to this case.

Was there probable cause in this case to stop, search and seize? In the case of Chambers v. Maroney, 399 U. S. 42 (90 SC 1975, 26 LE2d 419) (1970), police investigating the armed robbery of a service station learned from two teenagers that a blue station wagon containing four men had circled the block in the vicinity of the station prior to the robbery. The teenagers also reported that one of the men wore a green sweater, and the gas station attendant confirmed this. A description of the car and two robbers described by the teenagers and attendant was broadcast over the police radio. The car was spotted by police and stopped, the occupants arrested, and the car driven to the police station and searched. On appeal the Court upheld the validity of the warrantless search, holding that the arresting officers had probable cause to stop and arrest the robbery suspects, as well as probable cause to search their car for guns and stolen cash.

The facts supporting the stop and valid warrantless search in the present case are even stronger than those in Chambers v. Maroney, supra. First we should consider the credibility of the person supplying police with information leading to the arrest and search in each case. Relative credibility of witnesses to crime may be ranked, from most to least reliable, as follows: police officers, victims of crime, citizen bystanders, and professional or criminal informants. See LaFave, Search and Seizure § 3.4 (a) (1978). An eyewitness account of crime is of course the strongest evidence of all. In this case Butler saw the car parked *behind* the Majik Market, an unusual location for a customer's car. He then observed two white males *run* from the store, get in the car, and *carefully* leave the scene of the crime. Butler, after

discovering that a crime had occurred, remained at the scene and called police. When they arrived, Butler showed police where the victim lay and recounted what he had seen. Given these circumstances, Butler qualified as a reliable citizen, bystander, and was, to some degree, an eyewitness to the crime and to the suspects' getaway. His veracity may be assumed. See United States v. Darensbourg, 520 F2d 985 (5th Cir. 1975); LaFave, supra.

Based on the information supplied by Butler and broadcast over the police radio, there was reason to believe that the occupants of the black Camaro had committed a crime and were armed and dangerous. In Whiteley v. Warden, 401 U. S. 560 (91 SE 1031, 28 LE2d 306) (1971), the United States Supreme Court set out the principle that an arresting officer need not possess personal or direct knowledge of the facts which support probable cause in a particular case where such facts are relayed to him via police radio. The Court stated that police may arrest a suspect based on facts contained in a radio bulletin from another jurisdiction, and approved the practice of relying on reports from other jurisdictions containing little information within the arresting officers' direct knowledge. The rule of Whiteley has been satisfied here. See also *McNeal v. State,* 133 Ga. App. 225, 228 (211 SE2d 173) (1974).

Therefore, when Macon County Deputy Sheriff Beard heard the radio dispatch concerning the Americus Majik Market holdup, he had probable cause to stop the suspects, arrest them, search the car and seize any contraband contained therein. This is particularly true in light of the suspects' suspicious conduct once they were spotted by Officers Beard and Hayes on the Andersonville Highway. As the cars approached Andersonville with Beard and Hayes in pursuit, the occupants of the black Camaro slammed on the brakes and suddenly turned onto a side street. The officers' initial information concerning the suspects was corroborated by observation of their suspicious behavior in attempting to elude the officers. Taken together, these facts warranted in a man of reasonable caution the belief that a crime had been committed. Brinegar v. United States, 338 U. S. 160, 175-176 (69 SC 1302, 93 LE 1879) (1949). The officers possessed probable cause to stop the black Camaro, arrest its occupants, and perform a warrantless search of the automobile

The last question, dealing with exigent circumstances, must also be answered in the affirmative. Carroll v. United States, supra, distinguished searches of fixed premises from searches of moveable premises such as automobiles. The Court in Carroll noted that while a search warrant might readily be obtained for a fixed premises, it is not always practicable for police to secure a warrant authorizing an automobile search, since a vehicle can be moved quickly from the

locality or jurisdiction where the warrant must be sought. In United States v. Chadwick, 433 U. S. 1 (97 SC 2476, 53 LE2d 538) (1977); Rakas v. Illinois, 439 U. S. 128, 139-40 (99 SC 421, 58 LE2d 387) (1978), and Arkansas v. Sanders, 442 U. S. 753 (99 SC 2586, 61 LE2d 235) (1979), the Court added a new dimension to the "automobile exception" established in Carroll. The court in these cases established the rule that the occupant of a car has a diminished expectation of privacy. This, together with the "mobility" rationale discussed in Carroll, forms the basis of the modern rule.

In the case before us there is no question that exigent circumstances existed which justified the officers' warrantless search of the black Camaro. A crime had been committed and reported to the police, the suspects were fleeing in a car, and once detected they attempted to evade police. It is clear that "exigency" must be measured both "forward" and "backward" from the time of a search and seizure. Whitebread, Criminal Procedure, p. 147 (1980). In most cases police come upon a vehicle unexpectedly. In this situation, a reviewing court measures the exigent circumstances "forward" from the time police come in contact with the suspected vehicle. Here the officers, armed with a description of the vehicle and its occupants from a radio dispatch, had no time to obtain a warrant. The car and its occupants were fleeing. Exigency certainly existed here.

To summarize, in this case we have a moveable vehicle in which the individual has a lessened expectation of privacy, together with the twin conditions of probable cause and exigent circumstances. The probable cause supporting Sanborn's arrest also authorized a search of the car for weapons where, as here, exigent circumstances were present. Therefore the stop, arrest, search of the car and seizure of Sanborn's gun were not unreasonable. The trial court properly denied the motion to suppress.

Since both the arrest of Sanborn and the subsequent search of the automobile were lawful, it is not necessary to discuss the question of "standing." However, since the majority chooses to discuss Sanborn's standing to challenge the search, I feel compelled to state my views on this issue. Standing, once a burning issue in Fourth Amendment jurisprudence, now has little significance independent of the substantive protection of the Fourth Amendment itself. "[W]e think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing . . . Analyzed in these terms, the question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a

determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Rakas v. Illinois, 439 U. S., supra, at 139-40. Thus, as the majority correctly states, the question is whether Sanborn (irrespective of whether the car was stolen or not) had a legitimate expectation of privacy in the black Camaro searched by police. Under Rakas v. Illinois, supra, no such expectation of privacy existed here.

Prior to the Rakas decision of the United States Supreme Court, Sanborn would have been entitled to assert the "automatic standing" doctrine of Jones v. United States, 362 U. S. 257 (80 SC 725, 4 LE2d 697) (1960). However, Jones was explicitly overruled in United States v. Salvucci, 448 U. S. 83 (100 SC 2547, 65 LE2d 619) (1980). A brief history of the Fourth Amendment standing doctrine may be helpful at this point.

Prior to Jones, a defendant in filing a motion to suppress had "to allege either that he owned or possessed the property seized or that he had a possessory interest in the premises searched greater than the interest of an 'invitee or guest.' " Jones, supra at 263. Jones pointed out the "Catch 22" situation a defendant would occupy if, in order to file a motion to suppress, he must either admit ownership of the contraband or establish ownership and/or control of the premises in which it was found. To do this prior to trial meant that possession of the drugs was admitted, and that this admission could be used at trial. If the defendant did not own or control the premises, he was forced to lie about ownership and thus perjure himself. Truly such a defendant was on the horns of a dilemma. Jones stated that a defendant caught in such a situation did not have to admit possession, or have ownership of the premises. His standing to object to the search and seizure was based upon being "legitimately on the premises." In Jones the Defendant was legitimately in another's home at the time of the search and seizure. Therefore the court concluded that Jones had standing to move to suppress the contraband without having to claim ownership of the contraband or show ownership of the house.

In the case of Rakas v. Illinois, supra, acting upon a robbery report, police stopped a car, arrested Rakas (a passenger), searched the car and found a shotgun under the front seat and a box of shells in the glove compartment. Rakas filed a motion to suppress in the trial court. The court, relying on Jones, supra, denied the motion. The Supreme Court of the United States held that the test promulgated by Jones — whether the aggrieved party was "legitimately on the premises" — was too broad an application of the Fourth Amendment. The test, the court said, was whether the person has a "legitimate

expectation of privacy in the invaded place." Then the Court pointed out that cars are not treated identically to houses for Fourth Amendment purposes. In conclusion the Rakas Court stated that since Rakas was a mere passenger in the car, he did not possess the legitimate expectation of privacy contemplated by the decision. The court then put forth the proposition that Fourth Amendment rights are personal and a person could not complain about the illegal search of a third party's premises or property (car) because none of his own Fourth Amendment rights had been infringed.

Finally in 1980, in the case of United States v. Salvucci, supra, the Court held that inasmuch as the underlying rationale of Jones, supra, had been eroded, it was therefore overruled and that Rakas,[2] supra, provides the correct standard. The Court noted that in Simmons v. United States, 390 U. S. 377 (88 SC 967, 19 LE2d 1247) (1968), it had held that a defendant could claim possession to establish standing for a motion to suppress and this claim could not later be introduced at trial. The self-incrimination dilemma of the pre-Jones era was eliminated and the reason for Jones' existence vanished.

Under these principles, appellant could not assert standing under Jones irrespective of whether the car was stolen or not. His only defense was "have any of my Fourth Amendment rights been violated." Under Rakas any defense of his had to be personal. He was a passenger. The ownership of the car made no difference as to his defense to the search. Because, under Rakas, a passenger of an automobile has no legitimate expectation of privacy in the areas searched by police in this case, Sanborn's motion to suppress was properly denied. I therefore concur in the judgment of the court in this case.

---

[2] Rakas was an automobile case and Jones was a residence case. In Salvucci a home was also involved. Thus the Court equated automobiles and houses, making no distinction when applying the rule set forth in Rakas.