## 42101. CURRY v. THE STATE.
(336 SE2d 762)

MARSHALL, Presiding Justice.

This is a death penalty case. On May 10, 1984, the home of Laura

Will Sheram was burglarized, and she was raped and murdered. Walter William Curry was indicted for these offenses and a trial commenced on December 3, 1984. On December 5, after a jury was selected, Curry entered a plea of guilty to all three counts of the indictment. The trial continued on the issue of sentence, and on December 6, the jury recommended a death sentence. The case is here on direct appeal, for review under the Unified Appeal Procedure (252 Ga. A-13 et seq.), and for the Sentence Review required by OCGA § 17-10-35.[1] We affirm.

### Enumerations of Error

1. In his second enumeration, Curry alleges error in the denial of his motion to suppress, citing *Aguilar v. Texas*, 378 U. S. 108 (84 SC 1509, 12 LE2d 723) (1964).

On May 15, 1984, Washington County Sheriff Jimmy Walton obtained a warrant to search Curry's residence. The warrant was supported by the following affidavit, sworn to by the sheriff:

"During the early morning hours of May 10, 1984, Mrs. Laura Sheram was found beaten to death and raped in her home on Main St. in Tennille, Ga. Officers observed that Mrs. Sheram was murdered in her bedroom. Blood was observed in numerous places on her floor, bed-sheet, bed-headboard, and on her body. Dr. Larry Howard performed an autopsy and found she had been beaten about the face and bled severely from her nose and vagina. A green canvas-type hat with Negroid-appearing hair was found within feet of a window of Mrs. Sheram's house which was broken [at] the apparent point of entry. A 'Winston 100' cigarette butt freshly put out was located on a table adjacent to the bedroom where Mrs. Sheram was murdered. Tennis shoe prints were observed at the scene. One male sock was found in Mrs. Sheram's bed with Negroid hairs.

"Your affiant was advised by TPD Officer David Lewis on this date of the following: On this date a confidential, reliable informant advised that the hat found by officers at the scene was observed recently worn by Walter William Curry. This informant personally observed this hat. This informant also advised, 'Talk to Mrs. Kelsey about the bloody clothes.' Mrs. Kelsey is the affiant's [sic] grandmother and lives with Walter William Curry at the residence herein described. David Lewis advised this informant is reliable as it has given him information on three occasions during the last 6 months as

---

[1] Curry was sentenced December 6, 1984. He filed a motion for new trial on January 7, 1985, and amended the motion February 7, 1985. It was heard February 13, 1985, and denied February 21, 1985. The case was docketed in this court March 14, 1985, and was orally argued on May 8, 1985.

to the whereabouts of subjects David Lewis had re-arrest warrants for. This information proved to be correct as David Lewis was able to arrest these subjects based on the informant information.

"Mrs. Kelsey was exhibited the hat found at the murder scene by O/s Mitch Rice and advised it was Walter William Curry's hat.

"Walter William Curry was arrested on 5/13/84 by TPD officers in a stolen car. This car was searched on 5/15/84 by O/s Mitch Rice and Winston 100 cigarette butts were found in the ash tray. When Walter William Curry was observed by arresting officers, his shoe size was noted to be the same as shoe tracks found at the murder scene."

Pretermitting whether by his plea of guilty Curry waived any objection to the admission of the fruits of the search at the *sentencing phase* of the trial, as the state contends, and addressing this enumeration of error on its merits, we find no error.

The approach taken in *Aguilar* and in *Spinelli v. United States,* 393 U. S. 410 (89 SC 584, 21 LE2d 637) (1969), has been "rejected . . . as hypertechnical and divorced from 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Cit.]." *Massachusetts v. Upton,* ___ U. S. ___ (104 SC 2085, ___ LE2d ___) (1984). Therefore, we review this search warrant using the "totality of the circumstances" analysis of *Illinois v. Gates,* 462 U. S. 213 (103 SC 2317, 76 LE2d 527) (1983), rather than the "two-pronged test" of *Aguilar* and *Spinelli,* on which Curry relies.

Of course, even under the *Gates* analysis, an informant's "veracity," "reliability," and "basis of knowledge," although not independently dispositive, are not irrelevant. They are instead several of a number of relevant factors, which we must review giving "great deference" to the magistrate's determination of probable cause, keeping in mind that "affidavits are normally drafted by non-lawyers in the midst and haste of a criminal investigation." *Illinois v. Gates,* supra, 103 SC 2329-31.

In this case, regardless of any possible deficiency in the showing of the informant's veracity, reliability, or basis of knowledge, the tip was corroborated by Curry's grandmother, who identified the murder-scene cap as the defendant's. This identification, conjoined with the other information supplied by the affidavit, including the similar cigarettes and shoe size, was sufficient to support the magistrate's issuance of the search warrant.

2. Enumerations 1, 3, 4, 5, 6, 7, 8, 13 and 15 complain of various aspects of the voir dire, including an alleged need for a change of venue. We address these contentions below, not necessarily in the order raised.

(a) Curry contends that the denial of sequestered voir dire was error. He argues that, because sequestered voir dire was denied, "the

answers of the later jurors were affected by those given by the earlier jurors." Specifically, Curry argues, a number of prospective jurors who had formed opinions favoring the imposition of the death penalty in this case "figured out how they could remain on the jury," while a number of additional jurors "figured out how to get off the jury claiming opposition to the death penalty."

We are not prepared to accept the implicit accusation that a large number of prospective jurors lied under oath as a result of being "educated" by listening to the voir dire of other prospective jurors, but even if we were, it would not follow that all those favorable to the state schemed to stay on while all those favorable to the defense plotted to get off.

We find no support for these factual allegations in the comparative excusal rates of the various panels of prospective jurors, and we find no abuse of discretion in the court's denial of sequestered voir dire, either individually, or by panels.[2] *Sanborn v. State*, 251 Ga. 169 (3) (304 SE2d 377) (1983).

(b) Curry complains that, in several instances, the trial court refused to allow defense voir dire questions seeking to discover whether prospective jurors had formed pre-judgments concerning the punishment to be imposed, or would be unable or unwilling to consider mitigating circumstances.

The scope of the voir dire examination should be broad enough to allow the parties to ascertain the fairness and impartiality of the prospective jurors. See *Jordan v. State*, 247 Ga. 328, 338-339 (276 SE2d 224) (1981). On the other hand, prospective jurors should not be asked to pre-judge the case.

There is often a fine line "between questions which ask jurors how they would decide issues of a case if and when such issues are presented and questions which merely inquire whether jurors can start the case without bias or prior inclination." *Waters v. State*, 248 Ga. 355, 363 (283 SE2d 238) (1981). For this reason, the scope of the voir dire examination must, of necessity, be left to the sound discretion of the trial judge.

Reviewing the voir dire in this case, we find no abuse of discretion. While some of the questions excluded by the trial court, if minutely parsed and rigorously analyzed, arguably could have been allowed, nonetheless, the questions that were allowed were more than ample to allow the discovery of bias, prejudice and prior opinion.[3]

---

[2] Actually, the court reserved the right to sequester on a selective basis if the need arose, as it did on one occasion in which the prospective juror was examined out of the presence of the others concerning knowledge she had of the case.

[3] Curry does not support with citations to the record the two enumerations dealt with in this subdivision of the opinion. Thus, we do not know which questions, excluded upon objec-

*Devier v. State*, 253 Ga. 604 (2) (323 SE2d 150) (1984).

(c) Curry contends that the statutory question, "Are you conscientiously opposed to capital punishment?" (OCGA § 15-12-164 (a) (4)), is so confusing as to render it unconstitutionally vague.

It is true that some jurors have trouble understanding the question.[4] Typically, however, jurors comprehend the question, although they may have difficulty deciding how to answer it. Cf. *Wainwright v. Witt*, 469 U. S. ___ (105 SC 844, 83 LE2d 841) (1985). ("[V]eniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.") In any event, an affirmative answer to the question would, by itself, disqualify no juror, and the purpose of further voir dire is precisely to clarify the juror's views on capital punishment. See *Spivey v. State*, 253 Ga. 187, 197 (n. 3) (319 SE2d 420) (1984). Thus, Curry's contention that the question is unconstitutionally vague has no merit.

(d) Curry complains of the court's participation in the voir dire questioning.

We do not agree that the court's questioning invariably rehabilitated jurors exhibiting some bias against the defendant. Not only did the court's questioning in most cases simply clarify what the defense questioning had already established, on one occasion, the court's questioning resulted in the disqualification of a juror ostensibly rehabilitated by the state's examination. Transcript, pp. 429-32.

Moreover, we note that under Rule 10.1 of the new Uniform Superior Court Rules (which were not in effect when this case was tried), the trial judge is given the exclusive responsibility for asking "all Witherspoon and reverse-Witherspoon questions."

Absent some abuse of discretion, which we do not find here, participation by the trial judge in the voir dire examination of prospective jurors provides no basis for reversal.

(e) Curry argues that four prospective jurors were erroneously excused by the court, in that their answers "were not sufficiently positive in their objections to capital punishment" to disqualify them.

---

tion by the state, are deemed particularly important. Having reviewed the entire voir dire transcript, however, we can state that, given the length of the voir dire, there really were few objections, and that typically, when an objection was sustained, the defendant simply asked a number of substantially similar questions and often succeeded nonetheless in getting the juror excused for cause. See, for example, Trial Transcript pp. 64 and 70, 158 and 161, 537-38 and 543, 555-56 and 560.

[4] See, e.g., Trial Transcript pp. 444 and 447:
"Q. . . . Are you opposed to the death penalty?
A. What that mean? Opposed? What —
. . .
Q. You're against it?
A. Popposed or whatever you said."

It has been noted that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Wainwright v. Witt*, supra. Often, the answers of a prospective juror will to some degree be contradictory. See *Spivey v. State*, supra.

Thus it was in this case: On the state's examination, juror Adolphus testified that he was conscientiously opposed to the death penalty and would automatically vote against it, no matter what the evidence showed. On the examination by the defense, Adolphus testified that he could not even consider a death sentence and could imagine no crime bad enough that he could impose it. On examination by the court, Adolphus hedged somewhat, stating that if "something involved me very, very personally," he might be able to impose a death sentence. Then he again reaffirmed that he was "opposed to putting any one to death." Finally, he testified that he could not vote to impose a death sentence. On re-examination by the defense, he again stated that he could not even consider a death sentence.

The court did not err by finding this prospective juror to be disqualified. *Wainwright v. Witt*, supra.

Juror Bateman at first stated that although she was opposed to the death penalty, she would not automatically vote against it; there were circumstances under which she could vote for a death sentence. On further examination, she stated that if she had "a choice between life and death," she would "always take life." Then she clarified her previous answers by stating that if the law required her to impose a death sentence, she could, but if given the opportunity, she would vote against it. Then, on examination by the defense, when reminded of her original answer that under some circumstances she could vote to impose a death sentence, she answered, "I may have said it, but I didn't think about it." Throughout the remainder of her voir dire examination, she consistently affirmed her inability to vote for a death sentence. The court did not err by excusing her.

Juror Davis was a friend of the defendant's family. She stated that she was not sure that she could put her friendship aside and be completely fair and impartial, but she would try. She testified that she was generally "against" the electric chair, but might be for it in some cases. However, she stated that she definitely could never vote to impose it against any member of the defendant's family. Later, she equivocated, and, in response to defense examination, agreed that she would have to consider the death penalty "and vote for it if it was the right thing to do because of what that particular individual had done." Her final answer, though, was that she could never vote to impose the death sentence in this case. She was properly excused.

Juror Ford also was excused properly.

Although argument was presented only as to the above four pro-

spective jurors, Curry's enumeration of error lists a number of additional jurors as having been improperly excused. We have reviewed the voir dire examination of these prospective jurors and find no error.

(f) Curry further contends that the trial court erred by refusing to grant defense challenges to six prospective jurors.

We note that the trial court conducted a voir dire examination until 52 prospective jurors were qualified. However, only 50 were needed for the selection of a jury and two alternates. See OCGA §§ 15-12-165 and 15-12-169. Thus, persons who underwent voir dire after the 50th juror was empaneled were in no real sense prospective jurors, absent some disqualification or other loss of one of the 50 empaneled jurors. One of the six prospective jurors complained of here, being the 51st juror qualified, was such a person. See *Devier v. State*, supra.

Having reviewed the court's rulings as to the remaining five, we find no error. Although their answers were to some degree inconsistent, as above, the trial court did not err by concluding that the "final distillation" (*Spivey v. State*, supra) of their thought processes did not show a disqualifying bias or predisposition to impose a death sentence.

(g) A total of 86 prospective jurors were examined on voir dire to obtain a qualified panel of 50. Of the 36 excused, 17 were excused for conscientious objection to the death penalty, 10 were excused because they had decided that, if the defendant were found guilty, they were going to impose a death sentence, and 9 were excused for other bias, prejudice, or fixed opinion. Attributing, arguendo, the disqualification of the latter two groups to the effect of pre-trial publicity, we find that 19 of 86 prospective jurors (22.1%) were excused as the result of pre-trial publicity.

Considering this low percentage together with the evidence of pre-trial publicity proffered by Curry in support of his motion for change of venue, we find no error in the denial of the motion. *Kesler v. State*, 249 Ga. 462, 472 (291 SE2d 497) (1982); *Messer v. State*, 247 Ga. 316 (4) (276 SE2d 15) (1981); *Street v. State*, 237 Ga. 307, 311 (227 SE2d 750) (1976).

3. In his 14th enumeration, Curry argues that the trial judge should have recused himself on his own motion, in view of the judge's bias as demonstrated by his post-verdict comments directed to the defendant in the presence of the jury as follows:

"Another thought that I wrote down, and I've expressed this thought to some people very confidentially. I found it hard to believe that some people in this community could say that they loved Mrs. Sheram so much they couldn't sit on the jury. Well, Mrs. Sheram is gone but there are other people that live here in this community by themselves and it's a sad day when we can't have people in Washing-

ton County to say that we will look after the good people in Washington County like Mrs. Sheram because we want to give — we would not be fair to the person that would take her life. And I find that very alarming. I have no criticism of anybody that's stepped off the jury for any reason. That's their business but I found that very difficult to accept for myself because Mrs. Sheram, I've known her and I've known her to be an outstanding citizen here in this community, but I was able to sit here and, I think, be objective in the trial of this case in which you were involved. And I don't believe anybody could have tried any harder to see that you got a fair trial and a fair shake . . ."

Curry argues that these remarks amount to an admonishment of prospective jurors who confessed to an inability to be fair and impartial jurors, and demonstrate the court's bias against the defendant.

We do not find the judge's remarks to be unambiguously susceptible only to an interpretation that he was chiding or admonishing potential jurors. In fact, he specifically stated that his purpose was not to criticize anyone stricken from the venire. The comments might have been meant simply as general observations on human nature. In any event, although it is no doubt "the better practice to refrain from such remarks under such circumstances," *Johnson v. State*, 46 Ga. App. 494, 495 (167 SE 900) (1932), we do not find a bias "of such a nature and intensity to prevent the defendant . . . from obtaining a [trial] uninfluenced by the court's prejudgment." *United States v. Thompson*, 483 F2d 527, 529 (3rd Cir. 1973).

We note that earlier, after the jury had retired to begin its deliberations, the lead defense attorney had placed a few observations of his own into the record, including the following: "The only final thing I would like to state is the manner of conducting the trial, as far as there's often accusations of a circus atmosphere or of some impartial [sic] atmosphere in the manner of the Court's conduct of the trial, and without waiving any objections that we have previously made in the record, I want to state in the record there has been no publicity show here. There has been no circus. It has been orderly. There has been order in every area and in every portion of the trial and I cannot imagine a trial conducted in a more fair manner as far as the proceedings. Thank you, sir."

4. Regarding enumerations 10 and 11, we find no error in the admission of gruesome photographs of the scene of the crime and the body of the victim. These photographs accurately portrayed the brutal nature of the crime. Curry "cannot now be heard to complain that the crime he committed was too horrible for the jury to observe in deciding whether or not to impose the death penalty." *Conklin v. State*, 254 Ga. 558, 573 (331 SE2d 532) (1985).

5. We find no merit to Curry's 12th enumeration. It is well settled that the state is not restricted to proving only the statutory aggravat-

ing circumstances designated in OCGA § 17-10-30 (b). See, e.g., OCGA § 17-10-2; *Zant v. Stephens*, 250 Ga. 97 (297 SE2d 1) (1982); *Horton v. State*, 249 Ga. 871, 874 (295 SE2d 281) (1982).

6. In his 9th enumeration, Curry complains of the court's refusal to give the defendant's requests to charge.

The court did not err by refusing to give Curry's first request to charge, enumerating specific possible mitigating circumstances. *Smith v. State*, 249 Ga. 228 (2) (290 SE2d 43) (1982).

That the sentencing procedure is not a mere counting process of aggravating and mitigating circumstances, was adequately explained by the charge given, in which, among other things, the jury was told that it could recommend a life sentence whether or not it found mitigating circumstances to exist. Thus, the court did not err by refusing Curry's second request to charge.

Nor did the court err by refusing the third request, which would have instructed the jury to presume that a life sentence meant that the defendant would spend the rest of his life in prison. The court did tell the jury that a life sentence is a life sentence, and the question of possible parole is not a proper jury consideration. *Horton v. State*, supra, 249 Ga. at 873.

7. By way of a supplemental brief, Curry additionally contends that his death sentence must be reversed because the jury did not find that he intended to take a life. We do not agree.

In the first place, "specific jury findings on the defendant's culpability are not a necessary constitutional corollary to the . . . holding in *Enmund* [*v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982).]" *Ross v. Kemp*, 756 F2d 1483, 1488 (11th Cir. 1985).

Secondly, Curry entered a plea of guilty to a charge of *malice* murder and was the sole actor in the crime. Thus, he is hardly in a position to contend that he, with no intent to kill, merely aided and abetted a murder that was committed by others. See *Allen v. State*, 253 Ga. 390 (7) (321 SE2d 710) (1984).

### Sentence Review

8. The jury found that the offense of murder was committed while the offender was engaged in the commission of the offenses of rape and burglary. See OCGA § 17-10-30 (b) (2). The evidence supports this finding beyond a reasonable doubt. OCGA § 17-10-35 (c) (2).

9. Having reviewed the record, we do not find that the death penalty was imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

10. The 84-year-old victim in this case was raped and beaten to death in her own home. Her nose was broken. (It was flattened.) Her

scalp was torn loose from her skull. The back of her head was swollen, bruised and lacerated from being beaten against the headboard of her bed. Her hyoid (a bone at the base of, and supporting the tongue) was fractured. Her eyes were blackened and swollen. Her hands and forearms showed "massive hemorrhage," having been injured, apparently, in a futile attempt to protect herself from being beaten to death. Her chest was crushed. Most of her ribs were broken. Her vagina was lacerated through its entire length. She died from a loss of blood, having "bled profusely from the vagina," from her nose and mouth and from "all over the top of her head."

Curry had a prior record of five burglaries and a motor vehicle theft.

The sentence of death imposed by the jury is neither excessive nor disproportionate. OCGA § 17-10-35 (c) (3). The cases listed in the appendix support the imposition of the death sentence in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Ross v. State,* 254 Ga. 22 (326 SE2d 194) (1985); *Devier v. State,* 253 Ga. 604 (323 SE2d 150) (1984); *Allen v. State,* 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State,* 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State,* 250 Ga. 66 (295 SE2d 727) (1982); *Messer v. State,* 247 Ga. 316 (276 SE2d 15) (1981); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State,* 246 Ga. 598 (272 SE2d 475) (1980); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Thomas v. State,* 245 Ga. 688 (266 SE2d 499) (1980); *Gates v. State,* 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State,* 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State,* 243 Ga. 291 (253 SE2d 729) (1979); *Spraggins v. State,* 243 Ga. 73 (252 SE2d 620) (1979); *Davis v. State,* 242 Ga. 901 (252 SE2d 443) (1979); *Johnson v. State,* 242 Ga. 649 (250 SE2d 394) (1978); *Moore v. State,* 240 Ga. 807 (243 SE2d 1) (1978); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976); *McCorquodale v. State,* 233 Ga. 369 (211 SE2d 577) (1974).

DECIDED NOVEMBER 27, 1985.

*Robert S. Reeves, Stephanie J. Batcheller, Marcus F. Price, Jr.,* for appellant.

*Richard A. Malone, District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Staff Assistant Attorney General,* for appellee.