## 40511. SPENCE v. THE STATE.

SMITH, Justice.

Otis Franklin Spence III was indicted for the shooting death of his mother, Sarah Jo Spence, and tried before a jury in Richmond County Superior Court. Appellant, who was 19 years old at the time of the offense, was convicted of murder and sentenced to life imprisonment. Appellant failed to pursue a direct appeal following his conviction in November 1982, but on September 9, 1983, he was granted leave to file an out of time appeal of his conviction to this court. In this appeal he raises five enumerations of error, chiefly attacking the trial judge's admission into evidence of a statement he made on January 5, 1982, in which he admitted shooting his mother. We find no error and affirm.

From the evidence introduced at trial, a jury was authorized to find that on October 30, 1981, the day of the shooting, appellant spent the afternoon with friends, arriving home at 2:30 p.m. His mother arrived home shortly thereafter. Following a brief conversation,

appellant, who apparently was angered by his mother's refusal to let him use the family car to attend a local fair that evening, walked to his parents' bedroom, retrieved his father's .22 caliber revolver from a dresser drawer, returned to the living room, and shot his mother twice in the head at close range, killing her. Appellant then took her car keys and went for a drive, stopping to see friends and to visit a local shopping center. Shortly before 5:00 p.m., he returned home and alerted police that he had found his mother shot to death. Lieutenant Ronnie Strength of the Richmond County Sheriff's Department questioned appellant on the night of the shooting. He denied knowledge of the crime, claiming instead that he had gotten home from school at 2:30 that afternoon, spoken amicably with his mother, gone for a drive alone in the car, then had returned to find her body slumped in the living room chair. Through subsequent investigation Strength learned that appellant had not attended his high school that day as he had claimed. Investigators also determined that because there was no sign of forced entry at the scene the shooting was probably an "inside job." Lieutenant Strength interviewed appellant again on November 4, but no new information surfaced concerning the shooting.

Appellant and his father continued to live together in the family residence. In early December of 1981 appellant's father discovered that several household items, including an outboard motor, a television set, and his deceased wife's wedding rings, were missing. The thefts were reported to police and appellant was arrested and charged with three counts of theft by taking on December 11. While incarcerated on the theft charges, appellant was questioned regularly (at least six times, according to the record) concerning his mother's death. On December 21, he gave Lieutenant Strength a statement in which he asserted that, one week after the shooting, he had disposed of the murder weapon by throwing it into the Clark Hill reservoir. Appellant did not explicitly admit killing his mother on this date, but he promised Strength that he would give him more details of the shooting on January 2, his birthday. Police searched without success the area appellant had indicated as the resting place for the murder weapon. (The gun was never recovered.) Finally, on January 5, 1982, appellant gave Lieutenant Strength a detailed statement describing how he had shot his mother on the afternoon of October 30, 1981. He was then indicted for murder. The theft charges were eventually dropped.

1. Although not enumerated as error by appellant, we have examined the evidence presented at trial and conclude that it was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of the murder of Sarah Jo Spence.

Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Appellant's only challenge to the sufficiency of the evidence is contained in his fourth enumeration, in which he alleges that the trial court erroneously denied his motion for a directed verdict. This enumeration is without merit. The evidence did not demand a verdict of acquittal. See OCGA § 17-9-1 (Code Ann. § 27-1802); *Graham v. State,* 250 Ga. 473 (1) (298 SE2d 499) (1983).

2. In his first enumeration of error, appellant alleges that his January 5 statement to police in which he admitted shooting his mother was improperly admitted because the statement was (a) the result of an illegal arrest, (b) made while appellant was held under an excessive bond, (c) not free and voluntary, and (d) made without the benefit of counsel. We will address the grounds for suppression of the statement in the order enumerated by appellant.

(a) Following the discovery by appellant's father that his former wife's wedding rings, an outboard motor, and a television set were missing from the family residence, the police were notified of the thefts and appellant was arrested on December 11, 1981. He was charged with three separate counts of theft by taking. At the pretrial hearing on appellant's motion to suppress his statement, Lieutenant Strength of the Richmond County Sheriff's Department testified that the decision to arrest appellant was based on information from appellant's father to the effect that appellant had previously stolen his mother's high school class ring and had pawned it (this theft was not reported to police), as well as an independent investigation by Strength which revealed that appellant had approached several acquaintances about selling the stolen items, and had actually sold the television for $50 and the boat motor for $65.

Appellant contends that his arrest was illegal because it was not based on probable cause, and that his inculpatory statement, which was obtained while he was in custody for the thefts, must be suppressed as a fruit of the illegal arrest. We do not agree. Based on the objective facts and circumstances known to investigators on December 11, a man of reasonable caution could have believed that the crime of theft had been committed by appellant. See Brinegar v. United States, 338 U. S. 160, 175-76 (69 SC 1302, 93 LE 1879) (1949); *Durden v. State,* 250 Ga. 325 (10) (297 SE2d 237) (1982). Appellant's contentions on this point are without merit.

(b) Next appellant contends that his statement should have been suppressed because it was made while he was held in police custody under an excessive bond for the theft charges. Following his arrest, appellant was incarcerated in the Richmond County jail and bond was set at $90,000 ($30,000 for each theft offense). Lieutenant Strength testified that a relatively high bond was thought to be

necessary for the following reasons: appellant's incarceration would facilitate the ongoing investigation into the death of his mother, for which appellant was the prime suspect; police were concerned for the safety of appellant's father if appellant were allowed to return home; and there was a chance that appellant might attempt to leave town to escape punishment for the thefts.

The amount of bail to be assessed in each criminal case is generally within the sound discretion of the trial judge, whose decision will not be reversed on appeal absent a clear abuse of that discretion. OCGA § 17-6-1 (Code Ann. § 27-901); *Jones v. Grimes,* 219 Ga. 585 (134 SE2d 790) (1964). When fixing the amount of bail, the judge is to consider chiefly the probability that the accused, if freed, will appear at trial; other factors to be considered include the accused's ability to pay, the seriousness of the offense, and the accused's character and reputation. Id. at 587. We cannot say that under the particular facts of this case, including appellant's past misdeeds and his father's justified fear for his safety, appellant's bail was so excessive as to constitute an abuse of the judge's discretion. This enumeration is without merit.

(c) Appellant contends that his January 5 statement was not freely and voluntarily made, but was the product of subtle coercion and duress occasioned by his four-week confinement on the theft charges, during which time, he alleges, he was subjected to continuous and persistent questioning by police officers, particularly Lieutenant Strength.

Prior to trial, and again at the beginning of the trial, a Jackson-Denno hearing was held to determine whether appellant's statement was freely and voluntarily made. On each occasion the judge determined that the statement was voluntary. Unless clearly erroneous, the trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal. *Strickland v. State,* 250 Ga. 624 (2) (300 SE2d 156) (1983). We find ample evidence to support the trial court's finding on this issue. Prior to giving the statements which were later used against him at trial, appellant was fully advised of his constitutional rights under the Miranda decision. Each time he executed a written waiver of those rights, then spoke with police. Appellant's allegations of coercion and threats by police are supported only by his trial testimony. His version of events was contradicted by every other witness who testified concerning the statements. In light of the totality of the circumstances surrounding appellant's statement, we find no error.

(d) The final reason advanced by appellant for suppression of his statement is that it was made without benefit of the presence of

counsel. Following appellant's arrest on theft charges, attorney Jim Thomas was appointed to represent him. Thomas appeared on appellant's behalf at a December 22, 1981, preliminary hearing at which appellant was bound over to the grand jury on the three theft counts, and appellant and Thomas conferred on several occasions thereafter.

Appellant cites Massiah v. United States, 377 U. S. 201 (84 SC 1199, 12 LE2d 246) (1964), for the proposition that it violated his Sixth Amendment right to counsel for police to interview appellant outside Thomas' presence once it was known he was represented by counsel. We reject this argument for three reasons. First, the record shows that appellant executed a waiver of counsel form prior to speaking to investigators on each of the occasions in question. This is "strong proof" that appellant knowingly and voluntarily waived any right he may have had to the presence of counsel during questioning. North Carolina v. Butler, 441 U. S. 369 (99 SC 1755, 60 LE2d 286) (1979). Moreover, although it appears that on January 5 police were aware that Thomas represented appellant on the theft charges, there is no indication in the record that either police, Thomas, or appellant understood that Thomas represented appellant in regard to the ongoing murder investigation. Thomas' trial testimony supports this view. It is settled that Massiah does not prohibit questioning of the sort employed here, where the investigation concerns an offense separate from that in which the accused is known to be represented by counsel. See *Drake v. State,* 245 Ga. 798 (1) (267 SE2d 237) (1980); United States v. Lisenby, 716 F2d 1355 (11th Cir. 1983) (en banc). Finally, it is doubtful that Massiah even applies here, since appellant made his statement prior to the institution of formal adversary proceedings against him on the murder charges. In *Drake v. State,* supra, we limited the rule of Massiah to post-indictment statements made outside of the presence of counsel: "Massiah speaks to circumstances in which incriminatory statements are elicited from a defendant without permission of his counsel employed or appointed in a case *in which he already has been indicted.*" Id. at 800. (Emphasis supplied.) For these reasons, this enumeration is without merit.

3. Prior to the introduction of appellant's January 5 statement at trial, the following exchange occurred between the trial judge, district attorney, and defense counsel: District Attorney [to witness]: "Tell the jury what you [and appellant] talked about." The Court [to Defense Attorney]: "Before you respond to that — Mr. Nicholson, you have a continuing objection, I am sure, to the content of the conversation. It is the subject matter of your pretrial motion that we took up. Mr. Nicholson has objected to the admissibility of the conversation and the admission statements, whatever they may turn

out to be, on the basis that from his client's standpoint they were not freely and voluntarily given. *The Court made a ruling determining that they were and that the conversations were admissible,* but that still does not do away with the continuing objection as to inadmissibility, and I want to point out that to the jury and for the record you want to make a continuing objection to any of this conversation between the defendant and the investigators and your client." Mr. Nicholson: "Yes, sir, and I think you should instruct the jury that it is a question of fact as to voluntariness." The Court: "Well, of course, my ruling was just to determine admissibility. My ruling does not bind them . . . It is an issue of fact just like any other issue of fact, it is in their discretion. At the conclusion of the case it is for you to determine the weight of the evidence." (Emphasis supplied.) Citing OCGA § 17-8-55 (Code Ann. § 81-1104), appellant in his second enumeration contends that this statement by the trial judge improperly expressed the court's opinion as to appellant's guilt. Appellant's trial counsel failed to either enter a contemporaneous objection or move for a mistrial based on these comments by the trial judge.

Once the preliminary issue of voluntariness has been determined by the trial judge outside of the jury's presence, the ultimate question of the voluntary character of the statement and its truthfulness is for the jury, and they are not bound by the trial court's earlier determination on this issue. *Young v. State,* 149 Ga. App. 78 (3) (253 SE2d 410) (1979). The trial judge here correctly recognized this principle, but his comments concerning his prior ruling were unnecessary and could have misled or confused the jury. Assuming, arguendo, that these comments can be construed as an opinion as to the guilt of the accused, however, appellant's failure to preserve this issue for appeal makes it unnecessary for us to address the merits of this enumeration. *State v. Griffin,* 240 Ga. 470 (241 SE2d 230) (1978).

4. Appellant's next enumeration attacks the admission into evidence of testimony by one Freddie Sanders, appellant's brother-in-law and a longtime friend of appellant's family. Sanders is an attorney, and appellant objected to the admission of his testimony concerning certain conversations between himself and Sanders on the ground that the communications were confidential and protected by the attorney-client privilege. See OCGA § 24-9-24 (Code Ann. § 38-419). The trial court determined that no attorney-client relationship existed and admitted the disputed testimony.

We agree that appellant failed to prove the existence of an attorney-client relationship between himself and Sanders. At trial Sanders testified that he spoke to appellant on three separate occasions, once on the night of his arrest, and two more times while

appellant was being held in jail, awaiting trial on murder charges. On each occasion, he testified, he spoke with appellant as a family friend, not a legal advisor; he told appellant that he did not represent him and to contact an attorney if he needed legal advice; and he was never appointed to represent appellant nor retained by him. Given these facts, we hold that no attorney-client relationship existed, nor could appellant have reasonably believed that Sanders represented him on the murder charge. See *Brown v. Matthews,* 79 Ga. 1 (4 SE 13) (1887); Green, Georgia Law of Evidence § 181 (2d ed. 1983).

5. In his final enumeration appellant challenges the following charge given by the trial judge: "I charge you that you may infer that a person of sound mind and discretion intends . . . to accomplish the natural and probable consequences of his intentional acts, and if a person of sound mind and discretion intentionally and without justification uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily used and thereby cause the death of a human being, you may infer the intent to kill. This inference, as all inferences, may be rebutted."

Appellant argues that this charge relieved the state of its burden of proving intent to kill, an essential element of the crime of murder, in violation of Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979). However, in *Hosch v. State,* 246 Ga. 417 (271 SE2d 817) (1980), this court specifically approved the use of an identical charge. Id. at 420 n. 2. The charge given here was a correct statement of the applicable law and did not suffer from the constitutional defects alleged. This enumeration is without merit.

*Judgment affirmed. All the Justices concur, except Hill, C. J., and Weltner, J., who dissent.*

DECIDED MARCH 5, 1984 —
REHEARING DENIED MARCH 28, 1984.

*Richard L. Powell,* for appellant.
*Sam B. Sibley, Jr., District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn,* for appellee.

HILL, Chief Justice, dissenting.

The defendant's confession was obtained after he was confined to jail for four weeks, with bond set at $90,000 for three theft charges, to "facilitate the ongoing investigation into the death of the mother" (majority opinion, above, Division 2 (a)). He was "questioned regularly (at least six times, according to the record)" (majority opinion, statement of facts). Although the police knew that counsel had been appointed to represent the defendant on the three charges

on which he was being held, counsel was not present when the confession was given. When the confession was obtained, the theft charges were dropped. I therefore am unable to agree with the majority's conclusion that in light of the totality of the circumstances, the defendant's confession was voluntary. I therefore dissent and ask this question:

If the defendant had not confessed to murder after four weeks, how long would he have been held in jail and interrogated?

WELTNER, Justice, dissenting.

I dissent.

The Eighth Amendment to the Constitution of the United States (Code Ann. § 1-808) provides: "Excessive bail shall not be required. . . ."

Art. I, Sec. I, Par. XVII of our Georgia Constitution provides: "Excessive bail shall not be required . . . ."

Spence was arrested for and held under three charges — theft of his father's former wife's wedding rings; theft of an outboard motor; and theft of a television set. The evidence indicated that Spence had sold the television set for $50, and the motor for $65.

For these charges of theft by taking, bond was set at $30,000 for each offense — a total of *Ninety Thousand Dollars!*

It must be noted that the *only* charges lodged against Spence, and the *only* charges for which the bail of $90,000 was set, were the offenses of theft by taking, which were either misdemeanors or felonies, depending upon whether the objects stolen had values in excess of $500. OCGA §§ 16-8-2, 16-8-12 (Code Ann. §§ 26-1802, 26-1812).

The majority states that bail of $90,000 for the suspected theft of items which are worth, at most, a few hundred dollars was not "so excessive as to constitute an abuse of the judge's discretion." (Op., p. 341).

What, I inquire, would be excessive bail for three suspected thefts (of which two are likely misdemeanors) of property worth, at most, a few hundred dollars?

Two Hundred Thousand Dollars? Five Hundred Thousand Dollars?

One Million Dollars?

The majority cites in support of its position our case of *Jones v. Grimes,* 219 Ga. 585 (134 SE2d 790) (1964) — indeed, that is the *only* authority cited in that division of the opinion.

In that case, Jones was convicted of a misdemeanor and sentenced to twelve months on the public works, six months in jail, and a fine of $1,000. The trial court fixed bail at $20,000.

*This Court held that to be excessive,* holding:

"Excessive bail is the equivalent of a refusal to grant bail, and in such cases habeas corpus is an available and appropriate remedy for relief." 219 Ga. at 587. The court ordered Jones released, unless the trial court reduced the bail from $20,000 to $5,000. (Jones was already convicted, had no fixed residence anywhere, lived on a government pension paid from California, was a sojourner in Georgia, had been in and out of jail since coming to Georgia, had been arrested in ten different states, and additionally had served a federal sentence along with sentences in six different states. Compare that to the case of a 19-year-old, charged with three thefts of family property, held under pre-trial bail of $90,000.)

Were Spence not the principal suspect in the murder of his mother, I am satisfied that no judicial officer, from committing magistrate to Supreme Court Justice, would *ever* sanction such a bail requirement.

The fact of the matter is that the only reason the bail was set so high was that he was suspected of murder.

(The fact of the matter is that Spence's bail would be quite reasonable were he charged with murder.)

The fact of the matter is that he was *not* charged with murder — only theft by taking.

The fact of the matter is that the majority today approves a new system of bail, wherein a man may now be denied bail upon suspicion alone, *provided* there is at least some offense, misdemeanor or otherwise, with which he might formally be charged.

The fact of the matter is under the majority opinion, a man might be denied bail altogether by virtue of the existence — undisclosed and unformulated — of a suspicion latent somewhere within the mind of some police official!

That is distressing.

I further dissent to that portion of the majority opinion which approves the admission against Spence of the testimony of his lawyer.

When Spence was arrested, he called his brother-in-law, Sanders, who visited him in jail. Note the following testimony of Sanders:

"Question: You are an attorney, weren't you?

"Answer: Yes.

"Question: And he [Spence] was looking to you to advise him?

"Answer: I advised him."

The majority excuses this intrusion into the attorney-client relationship by stating "that no attorney-client relationship existed, nor could appellant have reasonably believed that Sanders represented him on the murder charge."

Why, I inquire, did Spence (at the time a 19-year-old high school student) call Sanders to the jail?

As family friend? As brother-in-law?

What, I inquire, was it that Spence needed to discuss with Sanders?

Relations with his father? Difficulties in school?

What, I inquire, could Spence — staring out from behind the bars of the Richmond County jail — "reasonably believe" (in the language of the majority, supra) to be the function of his lawyer brother-in-law?