### 41001. DEVIER v. THE STATE.
(323 SE2d 150)

BELL, Justice.

This is the third appearance of this death penalty case. On interlocutory appeal, this court affirmed the trial court's denial of Devier's challenge to the constitutionality of a statute which established the present Floyd-Bartow county line and, as well, the court's ruling on a motion to suppress. *Devier v. State,* 247 Ga. 635 (277 SE2d 729) (1981). Subsequently, Devier was convicted in Floyd County of rape and murder and sentenced to death. This court reversed, finding meritorious Devier's challenge to the array of the grand jury. *Devier v. State,* 250 Ga. 652 (300 SE2d 490) (1983). After reindictment, Devier

was retried, convicted and sentenced to death. He now appeals.[1]

1. Twelve-year-old Mary Frances Stoner lived with her parents in rural Bartow County and attended Adairsville High School. Darrell Gene Devier was employed as a tree-trimmer by a company which in November 1979 sent a crew to prune trees near the Stoner residence, along the Georgia Power right-of-way. The job took several days, during which time Devier on one occasion related to a fellow crew-member that he would like to have sex with the Stoner girl and on another occasion he was heard to observe, "It's time for the good-looking girl to get home from school."

The crew completed its work at noon on Friday, November 30, 1979, and received the remainder of the day off.

Shortly before 4:00 p.m. that day, two witnesses observed a dark-blue or black Ford Pinto with mag wheels parked at the exit of an abandoned truck stop approximately 150 feet north of the Stoner driveway. The driver was a white male with long hair and a beard. This car and its driver were also observed by several students on the school bus which dropped Mary Stoner off near her driveway between 3:55 and 4:00 p.m. A student who had been sitting with Mary Stoner exited at the next stop, about 50 yards further south. Upon exiting, she observed a dark-colored Pinto with mag wheels backing out of the Stoner driveway. It had two people in it.

The body of Mary Frances Stoner was found the next day in a wooded area in Floyd County, near the Floyd-Bartow county line. Her head was crushed. Several blood-stained rocks lay nearby, the largest of which weighed 49 pounds. Doctor Harvey Howell conducted the autopsy. In addition to the head injuries, Dr. Howell observed fresh tears and bruises in the vaginal area and discovered, inside her vagina, a large amount of blood-tinged fluid material. This material was later examined by a serologist from the state crime lab who testified that it contained spermatozoa. Dr. Howell testified that, in his opinion, Mary Stoner had been raped and that death had occurred soon afterwards as a result of severe brain injury and asphyxiation by choking.

Devier, who had long hair and a beard and owned a black Pinto with mag wheels, was arrested 5 days later.

Devier gave a statement which was transcribed and admitted in evidence at trial. He told the interrogating officers that he had been driving his black Pinto the afternoon of November 30, looking for a place to rent, when he saw the school bus just as Mary Frances Stoner

---

[1] The jury returned its verdict as to sentence on November 16, 1983. A motion for new trial was filed December 7, 1983, amended February 10, 1984, heard February 14, 1984, and denied the same day. A notice of appeal was filed March 12, 1984, and the record was docketed April 4, 1984. The case was orally argued June 28, 1984.

got off. The school bus left and he pulled into the driveway and asked her for some directions. She came to the car and sat in the passenger seat to look at a piece of paper he had "pulled out" of his "dash." Then he grabbed her and drove off, taking her to an isolated, wooded area. He stopped the car and told her to get into the back seat. She asked him if he was going to rape her and he told her "yes." After they had "sexual intercourse," he made her get out of the car.

Devier told the officers that he intended to tie her to a tree and then leave. However, she yelled at him and hit him in his chest and he pushed her. She fell and hit her head "on a rock or something" and when he saw that, he "just got down and started choking her." Then he left.

We have reviewed the evidence pursuant to Rule IV (B) (2) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq. It is sufficient to convince a rational trier of fact beyond a reasonable doubt that Devier raped and murdered Mary Frances Stoner. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his third enumeration of error, which is argued first, Devier contends the jury voir dire was overly restrictive.

The voir dire examination lasted three days and fills over 800 pages of transcript. The very length of the voir dire is a strong indication that it was not overly restrictive, and our review of it persuades us that it was not.

Control of the voir dire is vested in the sound discretion of the trial court and that discretion is not abused where, as here, both parties were given "an opportunity to ascertain the ability of the prospective jurors to decide the case on its merits, with objectivity and freedom from bias and prior inclination." *Waters v. State*, 248 Ga. 355, 363 (3) (283 SE2d 238) (1981). See also, *Henderson v. State*, 251 Ga. 398 (306 SE2d 645) (1983).

3. In his second enumeration, Devier complains of the trial court's refusal to grant challenges for cause to 30 prospective jurors whose answers on voir dire, Devier contends, demonstrate their bias.

In order to examine this enumeration of error, we deem it necessary to set forth an explanation of the mechanics of the voir dire examination and jury selection as it proceeded in this case, and to examine the status of the challenged jurors.

Sixty-four veniremen underwent voir dire, of which 22 were excused for cause, leaving a qualified panel of 42 from which the 12 trial jurors were selected, Devier being entitled to 20 peremptory strikes and the state, ten. OCGA § 15-12-165. Twelve additional veniremen were qualified to allow the selection of three alternate jurors, Devier here being entitled to six peremptory strikes and the state, three. OCGA § 15-12-169.

During the selection of the trial jurors, Devier used 14 of his al-

lotted 20 peremptory strikes. The state used all of its allotted strikes. Alternate jurors were then selected from the alternate jury panel, both parties using all of their alternate strikes.

Two of the prospective jurors complained of in this enumeration of error were, in fact, excused for cause, albeit for reasons other than Devier's initial challenges to these jurors.[2]

Eight of the prospective jurors complained of in this enumeration were members of the alternate jury panel. One was selected as an alternate juror. However, none of the trial jurors became incapacitated, see OCGA § 15-12-172, and the alternate jurors therefore did not participate in the jury deliberations. See OCGA § 15-12-171.

(a) Any possible error in the court's refusal to grant Devier's initial challenges to the two potential jurors who were later excused for other reasons is clearly harmless since Devier ultimately obtained the relief he initially sought, i.e., their disqualification.

(b) Also clearly harmless is any possible error regarding the seven challenged potential alternate jurors who were not selected. Their "presence did not affect the exercise of peremptory challenges during the selection of the 12 jurors who tried the case." *Spivey v. State*, 253 Ga. 187, 200 (319 SE2d 420) (1984). And regardless of their impact upon the selection of the alternate jurors, none of the alternate jurors was ever needed.

(c) The remaining challenged potential alternate juror was selected as an alternate juror. Although she did not participate in the deliberations, she did associate with the other jurors during the trial. See OCGA § 15-12-170; Patton v. Yount, ___ U. S. ___ (35 Cr. L. R. 3152, 3155) (Case No. 83-95, decided June 26, 1984).

This juror had not recently read anything about the case and was not aware of the prior verdict. She had never voiced an opinion about the case and had no present opinion regarding Devier's guilt or innocence, nor any bias or prejudice for or against him.

We need not decide whether a trial court could commit harmful error by erroneously refusing to excuse for cause a potential alternate juror who is selected as an alternate juror where none of the alternate jurors is called upon to participate in the jury deliberations, since the record clearly shows that the trial court did not err by refusing to excuse this juror.

(d) With regard to the remaining jurors, the state relies upon the general rule that " 'where it does not affirmatively appear from the record that a party had exhausted his peremptory challenges at the time the full panel of jurors was accepted and sworn, the appellate court will presume that he was not prejudiced by the action of the

---

[2] Transcript, Vol. 1, p. 309; Vol. 2, p. 664.

court in erroneously disallowing his challenge for cause, and will not grant a reversal for the alleged error.' [Cits.]" *Foster v. State*, 240 Ga. 858, 859 (242 SE2d 600) (1978).

However, in *Blankenship v. State*, 247 Ga. 590 (277 SE2d 505) (1981), we held that a Witherspoon error is not harmless in a death penalty case even where the state has failed to use all of its peremptory strikes.

Here, Devier had remaining six unused peremptory strikes. Whether the presumption of harmlessness noted in *Foster* should apply in a death penalty case in which the number of allegedly erroneous refusals to excuse for cause exceeds the number of unused peremptory strikes we need not decide.

We have carefully reviewed the voir dire examination of the remaining 20 allegedly unqualified prospective jurors. All of them had read or heard something about the case. However, ten of these challenged jurors testified that they had no prejudice or bias for or against the defendant, and had not formed or expressed an opinion regarding guilt or punishment. Two others testified that they previously had formed or expressed an opinion, but did not now have one. The remaining eight admitted at least to having tentative opinions regarding Devier's guilt or innocence or possible punishment. However, all of these jurors testified, under oath, that they could lay aside whatever opinions or impressions they might have and could decide the case based upon the evidence presented and the law as charged to them by the court. See *Spivey v. State*, supra; *Waters v. State*, supra.

The trial court did not err by concluding that none of these prospective jurors was disqualified.

4. In his first enumeration of error, Devier contends that his motion for change of venue should have been granted.

Devier supported his motion with copies of newspaper articles and transcripts of radio broadcasts by three local radio stations. The trial court reserved a ruling on the motion until after the jury voir dire.

After the jurors had been examined, the trial court noted that 76 prospective jurors were examined and that 16, or 21%, had been excused for publicity-related cause and stated: "I am convinced the atmosphere in this county is such, after having heard the . . . prospective jurors, that . . . the defendant can get a fair trial in this county." The motion for change of venue was denied.

In order to prevail on a motion for change of venue pursuant to OCGA § 17-7-150 (a), a defendant must show "(1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Street v. State*, 237 Ga. 307, 311 (227 SE2d 750) (1976). "[T]he empanelling of fair and impartial jurors, as demonstrated on

voir dire, makes it particularly difficult to show that the setting of the trial was inherently prejudicial." *Kesler v. State*, 249 Ga. 462, 472 (291 SE2d 497) (1982). Moreover, a trial court's finding that a defendant can receive a fair trial in the county in which the crime was committed will be upheld unless manifestly erroneous. Patton v. Yount, supra; Irvin v. Dowd, 366 U. S. 717 (81 SC 1639, 6 LE2d 751) (1961).

In Irvin v. Dowd, supra, the United States Supreme Court found manifest error in the refusal to change venue where the community had been "subjected to a barrage of inflammatory publicity immediately prior to trial," Murphy v. Florida, 421 U. S. 794, 798 (95 SC 2031, 44 LE2d 589) (1975), and where, of 370 prospective jurors examined, 90% entertained some opinion as to guilt (eight of whom were selected as trial jurors) and 62% were excused for cause because they had fixed opinions.

By contrast, in Patton v. Yount, supra, the Court found no manifest error in the refusal to change venue where the commission of the crime had preceded the trial under review by four years, by which time the prejudicial publicity and the community's sense of outrage had significantly diminished, even though the voir dire transcript showed that, of 163 prospective jurors examined, 77% admitted they would carry an opinion into the jury box (eight of whom were ultimately selected as trial or alternate jurors) and 59% were excused for cause for having firm opinions that could not be changed regardless of the evidence.

Here, as in Patton v. Yount, supra, nearly four years elapsed between the commission of the crime and the trial under review. In fact, of the numerous newspaper articles admitted in evidence, only two were written in the year preceding this trial, and these two were published 10 months prior to trial. Many of the radio broadcasts were more recent. However, we do not find that Floyd County had been "subjected to a barrage of inflammatory publicity immediately prior to trial . . .," Murphy v. Florida, supra at 798 or that the setting of the trial was "inherently prejudicial," *Kesler v. State*, supra.

Moreover, only 21% of the prospective jurors in this case were excused for having firm opinions resulting from pre-trial publicity, and *no* juror who had ever formed or expressed an opinion regarding the case was selected as a trial or alternate juror. We find no manifest error in the trial court's finding that Devier could receive a fair trial in Floyd County.

Devier's first enumeration of error is meritless.

5. In his fourth enumeration of error, Devier contends the trial court erred by denying his challenge to the constitutionality of Georgia's arrest law. See OCGA § 17-4-40 et seq.

Devier was arrested December 6, 1979, on a warrant charging him

with the rape of Linda Gail Elrod. The warrant affidavit included the facts required by OCGA § 17-4-41. It did not include facts sufficient to demonstrate probable cause for the issuance of the warrant. Georgia law imposes no requirement that arrest warrant affidavits include such information. *Roberts v. State*, 252 Ga. 227 (1) (314 SE2d 83) (1984).

That is not to say, however, that arrest warrants need not be supported by probable cause. "The Fourth Amendment . . . provides that '. . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . .' The decisions require that 'before a warrant for either arrest or search can issue . . . the judicial officer issuing such a warrant [must] be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.' [Cit.]" *Cofield v. State*, 247 Ga. 98, 109 (5) (274 SE2d 530) (1981).

We cannot agree with the Attorney General's contention that disclosure to the issuing magistrate of information sufficient to establish probable cause was "not required by law," or with the District Attorney's contention that a warrant affidavit complying with OCGA § 17-4-41 is alone sufficient to demonstrate the validity of an arrest warrant.

However, we do not agree with Devier's contention that the arrest warrant in this case was invalid.

Although "[t]he better practice clearly would be for the affidavit to show probable cause . . ., the Fourth Amendment does not by its terms require that probable cause be shown by the affidavit, but that 'the judicial officer . . . be supplied' with sufficient information to support his independent judgment that probable cause exists for the warrant. [Cit.]" *Cofield v. State*, supra at 109-110.

Here, the record shows that the officer who sought the warrant supplied the issuing magistrate with sufficient information to support a finding, which the magistrate made, that probable cause existed for the issuance of the warrant. The trial court did not err by overruling Devier's constitutional challenge to Georgia's arrest law.

6. Devier sought to introduce in evidence the results of a polygraph examination administered to him. In the absence of an express stipulation by both parties that these results would be admissible, the trial court did not err by ruling they were inadmissible. *Willis v. State*, 249 Ga. 261 (2) (290 SE2d 87) (1982); *State v. Chambers*, 240 Ga. 76 (239 SE2d 324) (1977). Devier's fifth enumeration is meritless.

7. Devier's sixth and seventh enumerations of error concern the admissibility of the results of his custodial interrogation.

The transcript of the Jackson-Denno hearing from the previous trial has been included in the record on this appeal. It was stipulated below that this nearly 600-page transcript would provide the eviden-

tiary basis on which the trial court would decide the issues involved in these two enumerations of error.

The evidence can be summarized as follows:

Devier's first contact with law enforcement officers concerning the disappearance of Mary Frances Stoner occurred late in the morning of December 1, 1979. FBI agent Bob Leary, accompanied by two Bartow County sheriff's deputies, visited Devier at his home in Bartow County. The victim's body, to their knowledge, had not yet been discovered. Leary identified himself and the others and told Devier that they were investigating "a crime" that had occurred the previous day, that Devier was one of a number of people they planned to talk to, and that they needed to know where he had been the previous afternoon. Devier replied that he could not exactly remember. Leary asked him if it might help him remember if he would accompany them and show them where he had gone the previous day after he got off work.

Leary testified that he told Devier he was not under arrest and that he was being asked to do this voluntarily. According to Leary, Devier replied that he understood and he voluntarily went with them.

They began to retrace Devier's various movements of the day before. They headed to a church at which Devier remembered parking when he met a friend. On the way, a call came over the radio advising them to go to the Barnsley Garden Road area. They arrived and the officers, leaving Devier alone in the police car, walked to a field road near which the victim's body had been found.

An officer stood near the police car, guarding the crime scene. Devier testified that Leary ordered the officer to make sure Devier stayed in the car. (Other testimony established that this particular automobile had operable inside door handles.) Leary testified, however, that he only told the officer to keep Devier off the premises of the crime scene. As far as Leary was concerned, Devier was free to go anywhere else.

Shortly, the officers returned to the car and continued their drive with Devier. They stopped at a service station upon observing the friend that Devier claimed to have been with Friday afternoon. Leary and one of the officers got out of the car and talked to the friend.

Devier testified that he asked the remaining officer if he could go to the bathroom and that the officer told him to stay in the car. The officer, however, testified to the contrary.

Leary testified that on another occasion, they stopped at a store to allow Devier to buy himself a pack of cigarettes. Devier entered the store alone and made his purchase.

Eventually, having accomplished their purpose, they drove to the Adairsville police department. There, Leary advised Devier of his Miranda rights, told him that his car had been identified as the one the

kidnapper had driven, that his friend had last seen Devier at 3:00 p.m., leaving a 3-½ hour gap which was not accounted for, and accused Devier of being the person who had kidnapped and murdered Mary Frances Stoner. Devier denied the accusation.

Leary asked if Devier would accompany him to Cartersville for further questioning. He again told Devier he was not under arrest or in custody and that if he went, it would be voluntary on his part. Devier agreed to go, saying that he wanted to clear himself.

They went to the Bartow County sheriff's office in Cartersville where Devier was given a polygraph examination, which he "passed." At approximately 6:00 p.m., he went home with his brother.

Leary testified that if at any time Devier had said, "Okay, I want to go home," he "would have felt obligated to take him home. He wasn't under arrest."

The next day, December 2, 1979, GBI agent Vernon Keenan, along with Bartow County sheriff's investigator Ray Sullivan, visited Devier at his home at approximately 10:30 a.m. Devier was advised of his Miranda rights and questioned briefly. The officers took some pictures of his automobile and then left.

Devier and his wife gathered their laundry together and drove to Rome. Shortly before 6:00 p.m., Devier was stopped by a Rome police officer pursuant to a lookout which had been placed on his automobile. Another nearby officer was called to the scene. This officer took Devier's driver's license and a pistol lying between the front seats. Devier was informed that Rome police investigators wanted to talk to him. The officer testified that he was unaware that other investigators had already talked to Devier.

Devier testified that he asked the officer if he was under arrest and the officer told him no, but "if you know what's good for you, . . . you'll follow me over there."

The officer testified that when he told Devier that he was wanted for questioning, Devier agreed to follow him to the Rome police station. The officer testified that he led the way in his car, followed by Devier in his, followed by the other police officer in his car.

The lead officer was asked what would have happened if Devier had pulled out of this convoy and sped away. The officer testified that he did not know and could not say.

Upon their arrival at the police station, the officer gave Devier's driver's license and pistol to another officer. Devier was then taken to an office, given his Miranda rights, and questioned.

Several officers who had previously talked to Devier were summoned to the Rome police station. Officer Sullivan testified that Devier was being "detained" for questioning. Asked whether, if Devier had attempted to leave, Sullivan would have tried to stop him, Sullivan answered, "It is possible." Devier made no incriminating

statements and, sometime after midnight, he was allowed to go home. He was not questioned again until after his arrest the afternoon of December 6, 1979.

In the interim, investigation continued. Among other things, it was learned that six months previously, Devier had possibly committed the rape of 12-year-old Linda Gail Elrod. This case was investigated and by December 6, it was felt by those in charge of the investigations that sufficient probable cause had been obtained to support an arrest warrant for the Elrod rape, as well as search warrants in the instant case. See *Devier v. State*, supra, 247 Ga. 635, 636-639. It was also felt that there was sufficient probable cause to arrest Devier for the Mary Frances Stoner murder-rape. However, it was deemed a closer question than in the Elrod case and the decision was made to arrest Devier for the latter rape.

Devier was arrested at approximately 5:30 p.m. on the premises of the Georgia Power Company in Rome. He was taken to the Floyd County police station in Rome, advised of his Miranda rights, which he waived, and interrogated. He confessed.

The confession was taped. However, the taping mechanism or the tape itself was faulty, and the tape was largely inaudible. The confession was repeated, and this time successfully transcribed, the next day.

(a) In his sixth enumeration of error, Devier contends he was illegally detained December 1 and again on December 2, in violation of the Fourth Amendment to the United States Constitution.

The state makes no claim that, on either December 1 or December 2, law enforcement officers had probable cause to arrest Devier. Instead, the state contends that Devier was not arrested on either of those dates.

It is true that Devier was not formally arrested until December 6. However, detention falling short of a formal arrest may violate the Fourth Amendment. Dunaway v. New York, 442 U. S. 200 (99 SC 2248, 60 LE2d 824) (1979). In United States v. Mendenhall, 446 U. S. 544, at 553-554 (100 SC 1870, 64 LE2d 497) (1980), Justice Stewart proposed that Fourth Amendment protections apply when, "by means of physical force or a show of authority . . . a reasonable person would have believed that he was not free to leave." A majority of the Supreme Court has adopted this standard. Florida v. Royer, ___ U. S. ___ (103 SC 1319, ___ LE2d ___) (1983). With limited exceptions, "seizures" require probable cause to arrest. Michigan v. Summers, 452 U. S. 692 (101 SC 2587, 69 LE2d 340) (1981); United States v. Brignoni-Ponce, 422 U. S. 873 (95 SC 2574, 45 LE2d 607) (1975); Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

In Dunaway v. New York, supra, the Court considered the following facts: Dunaway was taken into custody and transported to police

headquarters in a police car. He was not told that he was not under arrest; moreover, he would have been physically restrained if he had attempted to leave. He was placed in an interrogation room and questioned for an hour. He confessed. The state conceded that until Dunaway confessed, police did not have sufficient probable cause to make an arrest.

The Supreme Court held that Dunaway was seized on less than probable cause, that the extent of the seizure exceeded that authorized by Terry v. Ohio, supra, and its progeny, and that the seizure was therefore illegal.

In Florida v. Royer, supra, the Court considered these facts: Officers having reasonable suspicion falling short of probable cause to believe that Royer was carrying illegal drugs approached him in an airport concourse. They obtained his airline ticket and his driver's license. Without offering to return these items, the officers asked Royer to accompany them to a small room adjacent to the concourse. Royer was not told that he was not under arrest. Moreover, the state conceded that the officers would not have permitted Royer to leave the room even if he erroneously had thought that he could. The officers used Royer's baggage check stubs to obtain his luggage and brought it to the room. Royer was asked if he would consent to a search of the luggage. He was not told that his luggage would be returned if he refused to consent. Royer produced a key and the luggage was searched, resulting in the discovery of marijuana.

The Supreme Court held that Royer had been "seized" and that the scope of this seizure exceeded the permissible scope of a limited investigative detention authorized by Terry v. Ohio, supra, and its progeny. Therefore, the Court held, the purported consent to search was invalid.

As the Court stated in Florida v. Royer, supra, there is no "litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop . . . [T]here will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment."

Nonetheless, an examination of Royer and Dunaway, and the facts of the two cases, provides a useful background to our examination of the facts of this case.

The trial court found that Devier was not in custody on December 1. The evidence, while in conflict as to certain particulars, supports this finding.

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." Terry v. Ohio, supra, 392 U. S.

at 19, fn. 16. "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Cit.]" United States v. Mendenhall, supra, 446 U. S. at 553-554.

On December 1, Devier was told repeatedly that he was not under arrest and that he did not have to accompany the officers. The evidence shows that Devier voluntarily accompanied the officers and that if he had indicated, at any time, that he desired to return home, he would have been transported home. He was neither handcuffed, nor formally arrested, and moreover, the trial court was authorized by the evidence presented to find that on at least one occasion Devier was left completely unattended.

As a practical matter, of course, Devier suffered some restriction of his freedom of movement simply by virtue of being in a moving automobile some distance from his home. But that is necessarily the case whenever one voluntarily accepts a ride with another. The fact that Devier was largely dependent upon others for his locomotion does not mean that he was in "custody" under the Fourth Amendment. *Hardeman v. State*, 252 Ga. 286 (1) (313 SE2d 95) (1984).

The evidence amply supports the court's finding that on December 1, Devier had not been seized in violation of the Fourth Amendment.

Likewise, the evidence supports a finding that Devier was not seized the morning of December 2, when law enforcement officers visited Devier at his home and questioned him briefly.

However, we cannot agree that Devier had no objective reason to believe he was not in custody on the evening of December 2.

Unlike the prior occasions, Devier was not repeatedly told that he was free to go or that his continued cooperation was dependent upon his voluntary consent.

Moreover, even if we discount Devier's self-serving testimony that the officer who escorted him to the Rome police station patted his gun and told Devier that he had better accompany the officers, it is undisputed that Devier had been deprived of his driver's license and his pistol and that he was escorted to the police station surrounded by police cars. In addition, one of the interrogating officers testified that Devier was being "detained" for questioning and neither he nor the transporting officers could positively state that Devier would not have been stopped if he had attempted to leave.

Although Devier was not formally arrested, we find that he was "seized" within the meaning of the Fourth Amendment, and that the length of the seizure exceeded the permissible scope of Terry-type investigative detention not supported by probable cause.

However, Devier made no incriminating or inculpatory state-

ments the evening of December 2 and no statement made that evening, incriminatory or otherwise, was offered in evidence at trial. Thus, insofar as December 2 is concerned, there are no statements to suppress.

There remains the question whether the post-arrest statements given December 6 and 7 must be suppressed as a result of the illegalities of December 2.

"[A]lthough a confession after proper Miranda warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis. [Cit.]" Dunaway v. New York, supra, 442 U. S. at 217 (footnote omitted). In the Fourth Amendment context, the relevant inquiry is whether Devier's post-arrest statements were obtained by the exploitation of the illegality of December 2. Brown v. Illinois, 422 U. S. 590 (95 SC 2254, 45 LE2d 416) (1975); Wong Sun v. United States, 371 U. S. 471 (83 SC 407, 9 LE2d 441) (1963).

We conclude they were not. Devier was not formally arrested December 2 and, ultimately, was released. For four days, he was not in custody, nor was he questioned. Then he was lawfully arrested. In view of the temporal distance between the illegality and the confession and the intervening circumstance of a lawful arrest, we find that any "taint" was sufficiently "attenuated" to allow the admission of the post-arrest statements over a Fourth Amendment objection. Wong Sun v. United States, supra.

(b) Devier contends an additional violation of Dunaway v. New York, supra, in that he was arrested for one offense and questioned for another. We disagree. Devier was lawfully arrested on a valid warrant. We find no Fourth Amendment violation in the fact that he was then questioned about another offense. Cf. Spence v. State, 252 Ga. 338 (313 SE2d 475) (1984).

(c) In his seventh enumeration of error, Devier contends the trial court erred by ruling that the custodial statements made on December 6 and 7 were voluntarily given.

The evidence shows that Devier was properly advised of his Miranda rights, that he waived them, and that he voluntarily agreed to tell the officers about the Mary Frances Stoner crime. The fact that Devier told the officers (who, with the exception of Bob Leary, were from Floyd County) that he would tell them what happened if they would keep the Bartow County officers out of the interrogation room does not render the confessions involuntary or otherwise inadmissible. Nor do we find that the officers committed any impropriety by informing Devier that if the murder occurred in Floyd County, he would remain in the custody of Floyd County officers, but that if it occurred in Bartow County, he would be turned over to Bartow County officers.

The trial court's findings of voluntariness were not clearly erroneous and we therefore must accept them. *Rose v. State,* 249 Ga. 628 (2) (292 SE2d 678) (1982).

## Sentence Review

8. In his eighth enumeration of error, Devier contends the trial court erred by refusing to give four defense requests to charge. We have reviewed these requests, as well as the court's charge, and find that the requests which were not inappropriate were essentially covered by the court's charge. It is well settled that "[t]he failure to give requested instructions in the exact language requested, where the charge given substantially covers the same principles, is not grounds for reversal." *Kelly v. State,* 241 Ga. 190 (4) (243 SE2d 857) (1978).

Devier additionally contends the court's instructions on mitigating circumstances were inadequate.

The court charged as follows:

"Now, Ladies and Gentlemen, you should consider all of the evidence submitted in both phases of the trial of this case in arriving at your verdict as to the sentences to be imposed. This would include any and all evidence of mitigating circumstances received by you in this case. Mitigating circumstances are those circumstances which in fairness and mercy shall be considered by you in fixing punishment.

"I charge you that in reaching your decision to sentence the defendant to life imprisonment or to death, you are authorized and directed to consider as a mitigating factor any aspect of the defendant's character or record and any of the circumstances of the offense that the defense offers as a basis for a sentence less than death.

"As to each of the counts, Ladies and Gentlemen, I charge you that even if you should find beyond a reasonable doubt that the State has proved the existence of a statutory aggravating circumstance or circumstances which would justify the imposition of a death sentence, you are not required to recommend that the accused be put to death, and this is so even though you find that no mitigating circumstances were shown. Even though you may be authorized to recommend the death penalty, you are not required to do so. The law vests in the jury the exclusive right to either make or withhold a recommendation for the death penalty.

"The sentences to be imposed in this case are entirely within your discretion, and you may provide for a life sentence for murder for this accused or a life sentence or less for rape for this accused for any reason that is satisfactory to you or without any reason, if you care to do so.

"Of course, as to each of the counts; that is, Count I and Count II, if the State has failed to prove beyond a reasonable doubt that the

offense charged was committed under one or more of the statutory aggravating circumstances, as contended by the State, and described to you by the Court, you would not be authorized to recommend the death penalty. Without such a finding, the death penalty cannot be imposed."

The charge sufficiently instructed the jury as to mitigating circumstances. *Romine v. State*, 251 Ga. 208 (10) (305 SE2d 93) (1983).

Although not raised by Devier, we must express our disapproval of the court's instruction that: "The sentences to be imposed in this case are entirely within your discretion . . ." The law does not repose the matter of sentence entirely to the jury's discretion. A jury may not impose a death sentence unless it finds at least one statutory aggravating circumstance beyond a reasonable doubt. OCGA § 17-10-30 (c). Only if this threshold is crossed may the jury impose a death sentence. Only then may it exercise its discretion to choose between life and death. *Zant v. Stephens*, 250 Ga. 97 (297 SE2d 1) (1982).

However, we find no reversible error here, since the charge as a whole clarified the extent of the jury's discretion regarding the imposition of punishment.

9. In his ninth enumeration of error, Devier contends the trial court erred by overruling defense objections to the sentencing-phase testimony of Linda Gail Elrod.

Ms. Elrod testified that on June 2, 1979, she had been raped by Devier. She explained that she had known him for many years; that Devier had even lived in her home for a period of time. On the day in question, she and Devier had left her house in his car to go smoke some marijuana. They got into an argument and he asked her if he did not owe her "some licks from yesterday." She testified that he grabbed her, threw her into the back seat, and made her undress. Then, she testified, they had "sexual intercourse" without her consent.

Devier contends this testimony was not admissible in aggravation because it was not offered to prove a statutory aggravating circumstance; because it was a separate, independent crime not a part of the transaction on trial; and because it was not otherwise admissible since Devier had never been convicted of the rape of Linda Gail Elrod.

We find no merit to this enumeration.

The state is not limited to proof only of the enumerated statutory aggravating circumstances. *Godfrey v. Francis*, 251 Ga. 652, 660 (308 SE2d 806) (1983); *Zant v. Stephens*, supra.

On the issue of guilt or innocence, "the only relevant evidence is that which pertains to the offense with which the defendant is charged." *Fair v. State*, 245 Ga. 868, 873 (268 SE2d 316) (1980). On the issue of sentence, however, "the trier of fact must make a determination as to the sentence to be imposed, taking into consideration

all aspects of the crime, the past criminal record or lack thereof, and the defendant's general moral character. [Cits.] Any lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes is admissible in aggravation, subject to the notice provisions of the statute." Ibid; OCGA § 17-10-2.

Here, there is no question that the requisite notice was furnished. The objection is merely that the prior rape was not evidenced by a conviction.

In *Clenney v. State*, 229 Ga. 561 (4) (192 SE2d 907) (1972), this court held that the state could offer prior convictions in aggravation only if the state could demonstrate that those convictions were valid. Since the convictions offered in *Clenney* were facially invalid in that they failed to disclose representation by an attorney or the waiver of the right thereto, Clenney's sentence was reversed.

*Clenney* did not hold that convictions were necessary to prove prior conduct; only that invalid convictions were impermissible.

Here, the state did not rely upon an invalid conviction in aggravation. Instead, the prior rape was proved by the testimony of the victim of the rape. We find no statutory or constitutional bar to this procedure.

10. As to Count 1 (murder), the jury found as statutory aggravating circumstances that the murder was committed while the offender was engaged in the commission of rape, kidnapping with bodily injury and aggravated battery (OCGA § 17-10-30 (b) (2)) and that the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind and an aggravated battery to the victim (OCGA § 17-10-30 (b) (7)).

As to Count 2 (rape), the jury found as statutory aggravating circumstances that the rape was committed while the offender was in the commission of kidnapping with bodily injury and aggravated battery (OCGA § 17-10-30 (b) (2)) and that the offense of rape was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind and an aggravated battery to the victim (OCGA § 17-10-30 (b) (7)).

The death penalty was imposed on each count.

(a) We note that the trial court properly defined the offense of kidnapping with bodily injury in its sentencing charge. See *Rivers v. State*, 250 Ga. 303 (8) (298 SE2d 1) (1982). The evidence supports the jury's findings that the murder and the rape occurred during the commission of the offense of kidnapping with bodily injury. *Waters v. State*, supra, 248 Ga. 355 (11); *Peek v. State*, 239 Ga. 422, 431 (238 SE2d 12) (1977).

(b) The evidence supports the jury's finding that the offense of murder occurred during the commission of the offense of rape. We

note that this case presents no problem of "mutually supporting aggravating circumstances." Compare *Wilson v. State*, 250 Ga. 630 (9) (300 SE2d 640) (1983).

(c) Devier claimed in his confession that the victim fell and hit her head on a rock. However, the evidence showed that her head had been crushed and that several nearby rocks were bloodstained. The evidence indicated that these rocks were not in their original locations, but had been moved to the vicinity of the body from as far as 50 feet away. The evidence supports a finding that the murder and the rape involved the offense of aggravated battery, committed while the victim was still alive. See *Hance v. State*, 245 Ga. 856 (3) (268 SE2d 339) (1980).

We note that the trial court properly defined the offense of aggravated battery in its sentencing charge. *Rivers v. State*, supra.

(d) The offenses of rape and murder were in this case outrageously and wantonly vile, horrible and inhuman in that they involved torture, depravity of mind, and an aggravated battery to the victim. The evidence supports the jury's findings in this regard, and the facts of this case distinguish it from those cases in which a finding of the § (b) (7) statutory aggravating circumstance would not be appropriate. See *Allen v. State*, 253 Ga. 390 (6) (321 SE2d 710) (1984); *West v. State*, 252 Ga. 156 (Appendix) (313 SE2d 67) (1984); *Whittington v. State*, 252 Ga. 168 (9b) (313 SE2d 73) (1984); *Phillips v. State*, 250 Ga. 336 (6) (297 SE2d 217) (1982); *Hance v. State*, supra.

11. We find that the sentences of death imposed in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

12. We find that the sentences of death imposed in this case are neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the appendix support the death penalties in this case.

*Judgment affirmed. All the Justices concur, except Gregory, J., who concurs specially, and Smith, J., not participating.*

DECIDED NOVEMBER 29, 1984 —
REHEARING DENIED DECEMBER 12, 1984.

*J. Scott Callan, Albert F. Burkhalter, Jr.,* for appellant.
*F. Larry Salmon, District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn,* for appellee.

GREGORY, Justice, concurring specially.

I concur in the judgment of the majority opinion. However, I would reach that judgment through different rationale than that

stated in Division 9. I would hold that the testimony of Linda Gail Elrod is admissible as a necessary corollary to established Eighth Amendment jurisprudence.

In death penalty cases a constitutional requirement exists that the sentencer focus on the character of the individual defendant. It is on this basis, together with the circumstances of the offense, that the jury or the judge must decide between life and death for a defendant who is within the death eligible class. Zant v. Stephens, ___ U. S. ___ (103 SC 2733, 77 LE2d 235) (1983). In order for this decision to properly be made the broadest scope of evidence reasonably capable of presentation, both favorable and unfavorable to the defendant, must be presented. We are not dealing with technical rules of evidence. We must determine the scope of information properly considered by the sentencer in deciding between life and death.

Once the position that the death penalty is a per se violation of the Eighth Amendment proscription against cruel and unusual punishment (see concurring opinion of Brennan, J., in Furman v. Georgia, 408 U. S. 238 (92 SC 2726, 33 LE2d 346) (1972)) was rejected, there evolved two basic criteria for testing the constitutionality of a death penalty statute. First, Furman, supra, held that the scope of the death eligible class itself must not be overbroad. The imposition of the death penalty for a petty offense would obviously violate this principle. The outer circle of the permissible death eligible class was ultimately drawn at those who commit intentional homicide. Enmund v. Florida, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982).

Second is the criterion of individualization. It is unconstitutional to fix the scope of the death eligible class and make death mandatory for all who fall within the class. Woodson v. North Carolina, 428 U. S. 280 (96 SC 2978, 49 LE2d 944) (1976); Roberts v. Louisiana, 431 U. S. 633 (97 SC 1993, 52 LE2d 637) (1977). Every defendant has the right to be considered as an individual even though the crime committed brings him within the death eligible class. The death penalty may not be imposed without giving individual consideration to the character of the defendant. Who he or she is must be the subject of inquiry. It is unconstitutional to preclude consideration, as a mitigating factor, of any aspect of a defendant's character. Lockett v. Ohio, 438 U. S. 586 (98 SC 2954, 57 LE2d 973) (1978); Eddings v. Oklahoma, 455 U. S. 104 (102 SC 869, 71 LE2d 1) (1982).

A selection must be made from among those in the death eligible class based upon a consideration of the individual character of a given defendant within the class. Those among the class differ from each other in both positive and negative aspects of character. The good and the bad must be known if an informed selection process is to take place. It might suffice in a single case to allow consideration only of positive aspects of character. After all, any error would be in favor of

life. But, considered as a whole, the death penalty scheme depends upon the availability of full information (good and bad) in order that juries and judges make informed selections for the death penalty from those who are among the eligible. To withhold evidence of bad character in all cases would ultimately undermine the process because selection would proceed on less than adequate information. While the rules of evidence may exclude specific evidence in given instances, any rule with such a broad sweep as to exclude all evidence of prior crimes for which there has been no conviction would so limit the information available to the sentencer as to unlawfully restrict the individualization necessary under the Eighth Amendment. The system must allow access to this information in order to pass constitutional muster as a system.

APPENDIX.

*Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State*, 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *Messer v. State*, 247 Ga. 316 (276 SE2d 15) (1981); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Cape v. State*, 246 Ga. 520 (272 SE2d 487) (1980); *Thomas v. State*, 245 Ga. 688 (266 SE2d 499) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Spraggins v. State*, 243 Ga. 73 (252 SE2d 620) (1979); *Davis v. State*, 242 Ga. 901 (252 SE2d 443) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978); *Gibson v. State*, 236 Ga. 874 (226 SE2d 63) (1976); *McCorquodale v. State*, 233 Ga. 369 (211 SE2d 577) (1974).